IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Exel, Inc., f/u/b/o Sandoz, Inc.,** | Case No. 2:10-cv-994 |
| **Plaintiff,** | Judge Graham |
| v. | |
| | Magistrate Judge Abel |
| **Southern Refrigerated Transport, Inc.,** | |
| **Defendant.** | |

**OPINION AND ORDER**

Pending before the Court are the parties' cross-motions for summary judgment (docs. 93 and 97). For the following reasons, the Court GRANTS the Plaintiff's Motion for Summary Judgment (doc. 93) as to Count IV of the Complaint, DISMISSES Count III of the Complaint, and DENIES the Defendant's Motion for Summary Judgment (doc. 97).

**I.   Background**

The Plaintiff, Exel, Inc., is a freight broker that arranges for the transportation of commodities on behalf of its customers. The Defendant, Southern Refrigerated Transport, Inc. (SRT), is a motor carrier that provides transportation of cargo in interstate commerce. Non-party Sandoz, Inc. is a manufacturer of pharmaceutical products and, in the instant case, Exel's client.

In 2001, Sandoz contracted with Exel to provide transportation brokerage services to Sandoz. Last Aff. at ¶ 5, doc. 31-2. In late 2007, Exel contracted with SRT to transport Sandoz pharmaceuticals. Haldi Aff. at ¶ 7, doc. 31-3. Specifically, the parties executed a Master Transportation Services Agreement (MTSA), id. at ¶¶ 7–10, which purportedly governs the relationship between the parties in the instant case. The MTSA is a standardized agreement that Exel executes with any carrier hired to transport its clients' goods. Id. at ¶ 6.

1

The MTSA designates SRT as the "Carrier" and Exel as the "Customer." MTSA at 1, doc. 97-6. The MTSA generally defines the "Shipper" as the Customer's principal, id., in this case, Sandoz. It states that "Carrier agrees to accept for arrangement of shipment Commodities moving in . . . commerce . . . for transportation to the destinations designated by Customer in such a manner as to satisfy the specialized needs of Customer and/or Shipper." Id. at ¶ 3. The MTSA further provides that:

> Customer shall issue and Carrier shall sign freight receipts for each shipment in the form acceptable to Customer and the Shipper. If a bill of lading is used as a freight receipt, any terms, conditions or provisions thereof shall be subject and subordinate to the terms of this Agreement and, in the event of a conflict, this Agreement shall govern.

Id. at ¶ 4. Addressing the parties' respective liability under the agreement, the MTSA states:

> Carrier shall be liable to Customer for loss, damage or injury to the Commodities tendered to Carrier for transportation hereunder while the Commodities are in its, its agent or underlying carrier's custody, possession or control except to the extent (and only to the extent) such loss, damage or injury results from (i) acts of God, the public enemy or public authority, (ii) inherent vice or nature of the Commodities, or (iii) the negligent acts of Customer or Shipper.

Id. at ¶ 9(a). Continuing, the MTSA outlines the method for calculating damages under the agreement:

> The measurement of the loss, damage or injury to Commodities shall be the Shipper's replacement value applicable to the kind and quantity of Commodities so lost, damaged or destroyed. Customer shall deduct from the invoice price the reasonable salvage value of any damaged or injured Commodities not released to Carrier. Carrier acknowledges that some of the Commodities may be disposed of in a manner that will prevent the damaged goods from being sold on the open market.

Id. at ¶ 9(b).

In the winter of 2008, Exel arranged for SRT to transport a shipment of Sandoz pharmaceuticals from Exel's warehouse in Mechanicsburg, Pennsylvania to Memphis,

Tennessee. Last Aff. at ¶ 6, doc. 30-2. Prior to SRT transporting the shipment, a bill of lading was issued, which SRT signed. Bill of Lading, doc. 97-8. The bill of lading states:

> It is mutually agreed, as to each carrier of all or any said property over all or any portion of said route to destination and as to each party at any time interested in all or any of said property, that every service to be performed here-under shall be subject to all terms and conditions of the Uniform Domestic Straight Bill of Lading . . . in the applicable motor carrier classification or tariff . . . . Shipper hereby certifies that he is familiar with all the said terms and conditions of the said bill of lading set forth in the classification or tariff which governs the transportation of this shipment and the terms and conditions are hereby agreed to by shipper and accepted for himself and his assigns.

Id. In addition, the bill of lading describes the goods and number of units to be transported, the weight of the shipment, instructions for delivery, and the release value for the shipment. Id. Under the bill of lading, the release value[1] for the shipment is $56,766.36. Id.

While being transported by SRT, the shipment of pharmaceuticals was stolen in or near Dickson, Tennessee. Joint Stipulation of Facts at ¶ 3(b), doc. 94-4. Following the theft of the shipment, Exel filed a claim with SRT on behalf of Sandoz for $8,583,671.12, the alleged actual value of the lost pharmaceuticals. SRT subsequently denied Exel's claim, maintaining that the bill of lading limited its liability to $56,766.36. Compl. at ¶ 40, doc. 2.

Subsequently, Sandoz assigned its rights related to its claim concerning the lost pharmaceuticals to Exel. Assignment, doc. 31-6 at 3. Based on this assignment of rights, Exel filed its four-count Complaint "for the use and benefit of" Sandoz, alleging (1) breach of contract; (2) breach of bailment; (3) breach of the ICC Termination Act (formerly known as the Carmack Amendment); and (4) a request for declaratory judgment related to the MTSA. Complaint, doc. 2. Exel sought damages of $8,583,671.12. Id.

---

[1] The release value is calculated by multiplying the per-pound limit of liability (RVNX) by the weight in pounds of the cargo. Hecker Tr. at 108–12.

In response, SRT filed its Answer (doc. 5) and a Motion for Judgment on the Pleadings (doc. 6) as to Counts I, II, and IV of Exel's Complaint. In its Motion, SRT argued that the Carmack Amendment, 49 U.S.C. § 14706, *et seq.*, governed the relationship between the parties in this case and preempted Counts I, II, and IV of Exel's Complaint. The Court reviewed the Carmack Amendment and found that "[t]he Supreme Court has consistently interpreted the Carmack Amendment as broadly occupying the entire interstate shipment field of commerce." Opinion and Order at 6, doc. 24. Nonetheless, the Court noted, the Sixth Circuit had not addressed whether state law claims brought by a broker against a carrier fall within the preemptive scope of the Carmack Amendment. Id. at 8. After considering the existing case law, the Court concluded that "a broker's claim survives preemption only if it is based on the carrier's breach of a separate contractual obligation independent of its obligation as a carrier." Id. at 13 (internal citation and quotation omitted). Because neither party presented the MTSA to the Court and because Exel failed to identify a contractual obligation independent of the shipper-carrier relationship, the Court found that the Carmack Amendment preempted Counts I and II of Exel's Complaint. Id. at 12–14. The Court also declined to exercise jurisdiction over Exel's request for declaratory judgment. Id. at 14–17. Count III of Exel's Complaint remained pending.

Following the Court's ruling on SRT's Motion for Judgment on the Pleadings, the parties submitted cross-motions for summary judgment (docs. 29 & 30) as to Count III of Exel's Complaint. For the first time, the parties presented the MTSA to the Court with their motions. After oral arguments on the parties' motions, the Court found that the MTSA contained language that might create contractual obligations independent of the shipper-carrier relationship. Opinion & Order at 2–3, doc. 49. The Court concluded:

> The Court has . . . re-examined the complaint and noted that in its claim for declaratory judgment Exel did articulate a claim of individual rights under the

4

> MTSA. These factual allegations would be sufficient to support a claim for breach of contract. . . . The Court hereby *sua sponte* reconsiders its Opinion and Order of December 15, 2012 and amends that order to find that Plaintiff has alleged a claim for breach of contract based on the provisions of the MTSA, which may not be preempted by the Carmack Amendment.
> In light of this ruling, the Court will entertain briefing on the motions for summary judgment.

Id. at 3.

Upon receipt of the parties' supplemental briefs, the Court reviewed the MTSA and considered whether the Carmack Amendment preempted Exel's breach of contract claim. Opinion & Order at 6–12, doc. 59. The Court observed that the Carmack Amendment did not expressly preempt state-law claims between a broker and a carrier. Id. at 8. The Court then concluded that Exel's breach of contract claim under the MTSA was not precluded by implied preemption or conflict preemption. Id. at 8–12. As a result of this finding, the Court denied the parties' motions for summary judgment without prejudice and permitted Exel to proceed with its breach of contract claim. Id. at 12–13.

The parties subsequently conducted additional discovery and submitted new motions for summary judgment (docs. 93 & 97). The Court heard oral arguments on the parties' motions and the matter is now fully briefed and ripe for resolution.

**II.  Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary material in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law,

which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

**III.    Discussion**

Both parties now move for summary judgment. Exel argues that (1) the MTSA is an enforceable contract; (2) SRT breached the MTSA when it lost Sandoz's pharmaceuticals; and (3) pursuant to the terms of the MTSA, SRT is obligated to pay Exel the replacement value of those pharmaceuticals. Alternatively, Exel asserts, if the Court believes that the bill of lading controls this case, SRT is nonetheless required to pay the full value replacement cost of the lost pharmaceuticals.

SRT challenges each of these arguments. As to Exel's breach of contract claim, SRT first argues that it is pre-empted by the Carmack Amendment. Second, SRT asserts that the MTSA is not an enforceable contract. Third, SRT contends that Exel has not incurred any damages as a result of its conduct in this case. In SRT's view, the relationship between the parties in this case is controlled by the bills of lading, and, consequently, the Carmack Amendment. SRT maintains that Exel is entitled to judgment in the amount of $56,766.36 pursuant to the terms of the Carmack Amendment.

A.    *Exel's breach of contract claim is not preempted by the Carmack Amendment*

SRT continues to argue that Exel's breach of contract claim is preempted by the Carmack Amendment. According to SRT, Exel's claim involves nothing more than the loss of cargo by an interstate carrier. Such a loss, in its view, does not implicate contractual obligations independent of the traditional shipper-carrier relationship and is consequently governed by the Carmack

7

Amendment. SRT emphasizes the consequences of a finding that Exel's breach of contract claim is not preempted by the Carmack Amendment. Such a ruling would, according to SRT, subject it and similarly situated interstate carriers to "duplicative liability and inconsistent obligations":

> While Exel has attempted to mask the untenable reality of allowing a broker and a shipper to pursue claims for the same damages against a motor carrier by pursuing the assigned Carmack Amendment claim in this Court, Exel is in essence taking the position that Sandoz should be able to file a lawsuit against SRT in Tennessee under the Carmack Amendment, that Exel should be able to file a lawsuit for breach of contract in Ohio, and that SRT should be liable to both Sandoz and Exel for the same lost cargo. This is not legal precedent that this Court should set.

Def.'s Mot. for Summ. J. at 16-17, doc. 97.

The Court previously addressed Exel's breach of contract claim and the preemptive effect of the Carmack Amendment in two Opinion and Orders (docs. 49 & 59). After reviewing existing legal precedent and conducting its own preemption analysis, the Court concluded that the Carmack Amendment did not preempt the Exel's breach of contract claim against SRT. Opinion and Order at 6–12, doc. 59. The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona. v. California, 460 U.S. 605, 618 (1983). Consequently, a court should avoid reconsideration of those issues unless: "(1) substantially different evidence is raised on subsequent trial; (2) . . . a subsequent contrary view of the law is decided by the controlling authority; or (3) . . . a decision is clearly erroneous and would work a manifest injustice." Hanover Ins. Co. v. American Eng'g Co., 105 F.3d 306, 312 (6th Cir. 1997) (citations omitted).

SRT does not identify different evidence or subsequent controlling authority that compels reconsideration of the Court's earlier analysis. Implicit in SRT's filings is the assertion that the Court's prior decision was clearly erroneous and would work a manifest injustice.[2] Reasonable

---

[2] At the oral hearing, SRT cited Judge Smith's decision in Tokio Marine & Nichido Fire Ins. Co., Ltd. v. Flash Expedited Services, Inc., No. 2:12–cv–1057, 2013 WL 4010312 (S.D. Ohio Aug. 6, 2013) for the proposition

8

minds can disagree about whether a contract-based claim between a broker and a carrier is preempted by the Carmack Amendment. See VPP Group, LLC v. Total Quality Logistics, LLC, No. 13–cv–185–wmc, 2014 WL 1515510, at *10–11 (W.D. Wisc. Apr. 18, 2014) (concluding that Carmack Amendment did not preempt broker's contract claim against carrier); TransCorr National Logistics, LLC v. Chaler Corp., No. 1:08–cv–00375, 2008 WL 5272895, *4–5 (S.D. Ind. Dec. 19, 2008) (same); InTransit, Inc. v. Excel N. Am. Rd. Transp., Inc., 426 F. Supp. 2d 1136, 1141 (D. Or. 2006) (same); Edwards Bros., Inc. v. Overdrive Logistics, Inc., 581 S.E.2d 570, 572 (Ga. Ct. App. 2003) (same); but see Propak Logistics, Inc. v. Landstar Ranger, Inc., No. 2:11–CV–02202, 2012 WL 1068118, at *2–3 (W.D. Ark. Mar. 29, 2012) (holding that the Carmack Amendment preempted broker's contract claim against carrier); Dominion Res. Servs., Inc. v. 5k Logistics, Inc., no. 3:09–cv–315, 2010 WL 679845, at *1 (E.D. Va. Feb. 24, 2010) (same). No federal appellate courts have addressed this issue. UPS Supply Chain Solutions, Inc. v. Megatrux Transp., Inc., 750 F.3d 1282, 1294 n.12 (11th Cir. 2014). In the absence of further guidance from the court of appeals and in light of the split of authority among lower courts, the Court concludes that its earlier decision was not clearly erroneous. Therefore, the Court adheres to its earlier conclusion that the Carmack Amendment does not preempt the Exel's breach of contract claim against SRT.[3]

---

that "the Carmack Amendment has been interpreted to preempt all State law claims against the carrier for loss or damages to interstate shipments." Oral Hr'g Tr. at 21. Significantly, Judge Smith's decision did not concern a broker-carrier agreement like the MTSA at issue here:

> It is important to note that Plaintiff is not suing on the Broker/Carrier Agreement between Forward Air and Flash because it cannot. Plaintiff, or its insured, was not a party to that contract. Therefore, it should not be surprising that the Court will not apply the terms of that contract to this case.

Tokio Marine, 2013 WL 4010312, at *6. The Court is therefore not persuaded that Tokio Marine requires a finding that Exel's breach of contract claim against SRT is preempted by the Carmack Amendment in this case.

[3] SRT will not be subject to duplicative liability and inconsistent obligations in this case. "Because [Sandoz] has assigned its claim for the lost cargo to [Exel], [SRT] need not be concerned about a separate action by Sandoz, and Exel seeks recovery here under the bill of lading or the [MTSA], not both." Opinion and Order at 12,

B.  *The MTSA is an enforceable contract, which Exel has standing to enforce*

Next, SRT challenges the validity of the MTSA, arguing that there was no meeting of the minds as to the essential terms of the agreement. According to SRT, the MTSA fails to identify the subject matter of the contract, a quantity term, and a price term. Further, SRT contends, the MTSA is unenforceable because it fails to define the measure of damages for any purported breach of the agreement.

Exel offers numerous arguments in response, including that: (1) SRT admitted at oral argument and in their answer that the MTSA is an enforceable contract; (2) SRT failed to plead any defenses to the enforceability of the MTSA in its Answer; (3) the MTSA is a fully integrated contract; and (4) SRT previously performed pursuant to the MTSA.

In reply, SRT changes tack, conceding that the MTSA is an enforceable contract, but maintaining "that the MTSA is not the **contract of carriage** between **Sandoz and SRT** governing the transportation of Sandoz's cargo and any damages relating to the same." Def.'s Reply at 8, doc. 107. Consequently, SRT insists that the Court should enforce the only contract between Sandoz and SRT—the bill of lading.

Given SRT's concession that the MTSA is an enforceable contract, the Court is not persuaded by SRT's argument that the bill of lading should nonetheless control the outcome of this case. It is true that the bill of lading, and not the MTSA, is the contract of carriage between Sandoz and SRT. But the Court has previously conducted a preemption analysis and concluded that the MTSA provides Exel with grounds for an individual claim for breach of contract against

---

doc. 59. "[Exel] does not seek damages in an amount that could represent double recovery." Id. At oral argument, Exel reiterated that it was seeking recovery under the MTSA, or, in the alternative, the bill of lading. Oral Hr'g Tr. at 21–22.

10

SRT, independent of Sandoz's claim pursuant to the bill of lading.[4] SRT's argument is therefore without merit.

To the extent that SRT challenges the MTSA's failure to define "replacement value," its argument is unavailing. In determining the meaning of a contract, a court gives words and phrases their plain and ordinary meaning "'unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents' of the agreement." Sunoco, Inc. (R & M) v. Toledo Edison Co., 953 N.E.2d 285, 292–93 (Ohio 2011) (quoting Alexander v. Buckeye Pipe Line Co., 374 N.E.2d 146, paragraph two of the syllabus (Ohio 1978)). "It is common practice to resort to dictionaries as the best source for establishing the ordinary meaning of contractual terms." Rite Aid of Ohio, Inc. v. Marc's Variety Store, Inc., 638 N.E.2d 1056, 1061 (Ohio Ct. App. 1994) (collecting cases). Black's Law Dictionary defines replacement cost as "[t]he cost of a substitute asset that is equivalent to an asset currently held." Black's Law Dictionary 423 (10th ed. 2014). Sandoz's calculation of the replacement value of the lost pharmaceuticals is consistent with this definition, see Gargiule Dep. Tr., doc. 100-2; Sandoz Spreadsheet, doc. 100-1, and Exel has used Sandoz's replacement value as the basis of its request

---

[4] SRT makes much of the fact the instant action was brought "for the use and benefit of Sandoz, Inc.":

> Exel acknowledges in the Complaint that the lost cargo claim in this case was assigned to Exel by Sandoz. . . . Indeed, the plaintiff in this case is "Exel, Inc., f/u/b/o (for the use and benefit of) Sandoz". While Exel now claims to be asserting certain claims on its own behalf, it is not a party to this dispute in anything but a representative capacity. The purported contract claim is simply an attempt by Exel to recover the damages incurred by Sandoz, and Exel is pursuing a Carmack claim on behalf of Sandoz strictly in Exel's capacity as the assignee of Sandoz's claim. It is undisputed that Exel has not suffered any direct loss as a result of this cargo being stolen. The lost cargo at issue was owned by Sandoz, not Exel.

Def.'s Mot. for Summ. J. at 10 (internal citation omitted). This argument ignores the Court's prior finding that Exel's Complaint articulated an individual claim for breach of contract based on SRT's alleged breach of the MTSA. Opinion & Order at 3, doc. 49; Opinion & Order at 12–13, doc. 59. Thus, the Carmack Amendment claim for the use and benefit of Sandoz is an alternative claim to Exel's individual breach of contract claim.

for damages. The MTSA's lack of definition for "replacement value" is therefore not a bar to Exel's breach of contract claim.

C.  *The plain language of the MTSA establishes that SRT is liable to Exel for the loss of the pharmaceuticals*

Citing Dana Corp. v. Celotex Asbestos Settlement Trust, 251 F.3d 1107 (6th Cir. 2001), Exel maintains that the MTSA is a contract to pay that requires SRT to compensate it for the loss of the Sandoz pharmaceuticals. Distinguishing paragraph nine of the MTSA from a traditional indemnity provision, Exel contends that the loss of the pharmaceuticals—rather than a finding that Exel was liable for that loss and a subsequent payment by Exel to Sandoz—triggered SRT's obligation to pay Exel.

SRT vigorously contests these assertions. SRT argues that Exel's breach of contract claim must fail because Exel has not incurred any damages in this case. Instead, SRT asserts, the damages resulting from the loss of pharmaceuticals was borne exclusively by Sandoz. Further, SRT challenges Exel's contention that the MTSA is a contract to pay:

> The "contract to pay" cases cited by Exel have no application to the MTSA or this case generally. Exel cannot credibly argue that SRT, a motor carrier, is the equivalent of a "guarantor, surety, or bonding company" who has agreed to pay a "debt" that is a "sum certain." There is no "debt" that SRT has agreed to pay, and there can be no "sum certain." Exel fails to demonstrate to the contrary or even advance an argument that there is a "debt" relating to a "sum certain" in the MTSA. No legal authority is cited for the proposition that a transportation contract can be considered a "contract to pay."

Def.'s Resp. in Opp. at 8, doc. 102.

In reply, Exel emphasizes that courts have consistently likened the liability of motor carriers for the goods they transport to that of insurers. It is not unreasonable, in Exel's view, to treat a transportation contract as a contract to pay. To the extent that SRT argues that the MTSA

does not identify a sum certain owed to Exel, Exel cites the MTSA's provision providing for compensation measured by the replacement value of the lost goods. According to Exel, a specific monetary amount is not a prerequisite to an enforceable contract to pay, so long as the method of calculating the loss is set forth in the contract.

Although SRT maintains that Exel has not suffered any damages as a result of the loss of pharmaceuticals in this case, the record makes clear that Exel has incurred significant liability as a direct consequence of that loss.[5] This is best illustrated by Sandoz's January 29, 2009 letter to Exel:

> I am writing in response to your letter . . . regarding Sandoz's . . . claim for the [pharmaceuticals] lost on November 7, 2008 ("the Claim"). This is to advise you that Sandoz holds Exel fully liable for the Claim, and demands payment for the Claim in the amount of $8,583,631.10. Sandoz therefore rejects Exel's position that it is not liable for the loss, or that Sandoz must look to the carrier for recovery.
>
> As a broker and freight forwarder with respect to these shipments, Exel is fully liable for their loss. Exel engaged Southern Refrigerated Transport to transport the goods with the full knowledge of the risks in doing so, including the recent incident of loss involving Southern Refrigerated in August 2008. Moreover, regardless of whether Exel "tendered the freight" as you note in your letter, Exel remains liable to Sandoz for the loss.
>
> Finally, while we have also put Exel's carrier on notice of the claim, Sandoz seeks payment of the claim from Exel, and will hold Exel responsible for full payment.

Sandoz Letter, doc. 91-2.[6]

"The cardinal principle in contract interpretation is to give effect to the intent of the parties." Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp., — N.E.3d —, 2014 WL 3534994, at *3 (Ohio July 17, 2014) (citing Skivolocki v. E. Ohio Gas Co., 313 N.E.2d 374, paragraph one of

---

[5] The parties have not provided the Court with any contractual agreement between Exel and Sandoz. Consequently, it is unclear from the record whether Exel is contractually liable to Sandoz for the lost pharmaceuticals.

[6] At the oral hearing on the parties' motions for summary judgment, Exel reiterated that Sandoz holds Exel fully responsible for the loss of the pharmaceuticals at issue in this case. Oral Hr'g Tr. at 13–15.

the syllabus (Ohio 1974)).[7] In determining the intent of the parties, a court "will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." Sunoco, Inc. (R & M), 953 N.E.2d at 292.

Here, in the section entitled "Liabilities and Claims for Commodities," the MTSA's language is unequivocal and establishes that SRT is liable to Exel for the replacement value of the lost Sandoz pharmaceuticals:

> Carrier[8] shall be liable to Customer for loss, damage or injury to the Commodities tendered to Carrier for transportation hereunder while the Commodities are in its, its agent or underlying carrier's custody, possession or control except to the extent (and only to the extent) such loss, damage or injury results from (i) acts of God, the public enemy or public authority, (ii) inherent vice or nature of the Commodities, or (iii) the negligent acts of Customer or Shipper.
>
> The measurement of the loss, damage or injury to Commodities shall be the Shipper's replacement value applicable to the kind and quantity of Commodities so lost, damaged or destroyed. Customer shall deduct from the invoice price the reasonable salvage value of any damaged or injured Commodities not released to Carrier. Carrier acknowledges that some of the Commodities may be disposed of in a manner that will prevent the damaged goods from being sold on the open market.

MTSA at ¶ 9(a)-(b). The plain language of this provision reflects the parties' allocation of risk among themselves. In this instance, the parties agreed that SRT would be liable to Exel for any loss of cargo. The Court will enforce the parties' bargained for agreement accordingly.

D.   *The MTSA's limitation on cargo insurance does not limit SRT's liability to Exel for the lost pharmaceuticals*

---

[7] The MTSA provides that it is to be interpreted according to Ohio law. MTSA at ¶ 20.

[8] As previously noted, the MTSA designates SRT as the "Carrier" and Exel as the "Customer." MTSA at 1. The MTSA generally defines the "Shipper" as the Customer's principal, id., in this case, Sandoz.

14

Next, SRT argues that its liability to Exel for the loss of the Sandoz pharmaceuticals is limited to $100,000 pursuant to the paragraph 10(d) of the MTSA. Paragraph 10(d) provides that "Carrier . . . shall procure and maintain in force, at its own cost and expense, the following insurance with respect to the Services: . . . Cargo Insurance coverage in an amount max of $100,000 per vehicle." MTSA at ¶ 10(d). SRT insists that this limitation on cargo insurance was intended to function as an absolute cap on its liability. To support this conclusion, SRT cites Bay Machinery Services, Inc. v. Codan Forsikring A/S, et al., Case No. 4:08-cv-00368-SWW (E.D. Ark. Feb. 16, 2011), in which the district court purportedly held that a $100,000 cargo insurance policy entitled the carrier to a $100,000 limitation of liability.

Exel rebuts SRT's argument with the plain language of the MTSA, drawing the Court's attention to the MTSA's provision that states, "The Insurance required under this Section 10 does not limit Carrier's liability under the provisions of Sections 8 and 9." Pl.'s Resp. in Opp. at 16 (quoting MTSA at ¶ 10). Further, Exel cites cases in which courts have rejected the position that a carrier's limitation on cargo insurance is equivalent to a carrier's limitation of liability. Finally, Exel analyzes the Bay Machinery case and distinguishes it from the facts of the present case.

The plain language of the MTSA provides a clear answer to this dispute.[9] The MTSA states that SRT will maintain a maximum of $100,000 cargo insurance per vehicle. MTSA at ¶

---

[9] To support its argument, SRT cites the deposition testimony of Rodney Danley, SRT's director of pricing. Danley testified that "in [the transportation] industry liability and insurance are a lot of times looked at as the same thing." Danley Dep. Tr. at 42, doc. 92-1. He further stated:

> My intention and understanding was that SRT would be – that was our liability. Our insurance would pay $100,000 if there was a loss, damage, theft, whatever. If there was an issue, that was the maximum amount that we would be out.

15

10(d). Paragraph 10 makes no explicit reference to the limitation on cargo insurance acting as an absolute cap on liability for lost cargo. To the contrary, the MTSA unconditionally states, "The Insurance required under this Section 10 *does not limit Carrier's liability under the provisions of Sections 8 and 9*." Id. at ¶ 10 (emphasis added). The plain language of the MTSA compels the conclusion that the $100,000 limitation on cargo insurance does not limit SRT's liability to Exel for the lost pharmaceuticals. SRT's argument is therefore without merit.[10]

E. *SRT is liable to Exel for the replacement value of the Sandoz pharmaceuticals, $5,890,338.82*

Pursuant to the MTSA, SRT is liable to Exel for the loss of the pharmaceuticals while those pharmaceuticals were in the possession of SRT. MTSA at ¶ 9(a). The MTSA further provides that "[t]he measurement of loss . . . shall be [Sandoz's] replacement value applicable to the kind and quantity of Commodities lost." Id. at ¶ 9(b). In support of its Motion for Summary Judgment, Exel has submitted under seal (1) the deposition of Martin Gargiule, Director of Finance in Business Planning and Analysis Group for Sandoz, Gargiule Dep. Tr., doc. 100-2; and (2) a spreadsheet detailing the cost and pricing of the pharmaceuticals lost by SRT, doc. 100-1. In the deposition excerpts presented to the Court, Gargiule discussed the contents of the spreadsheets and explained how they were created. Gargiule Dep. Tr. at 13–18, 22–24. He then discussed how Sandoz's replacement value was calculated and testified that Sandoz's

---

Id. at 44. Given the clarity of the MTSA's language, the Court does not consider this extrinsic evidence in ascertaining the parties' intent. See Sunoco, Inc. (R & M), 953 N.E.2d at 292 ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties").

[10] As previously noted, SRT cites Bay Machinery Services, Inc. v. Codan Forsikring A/S, et al., to support its position. However, SRT does not provide a Lexis or Westlaw citation for this case, nor has it attached a copy of the decision with its filings in this case. The Court has not been able to find this case in either Lexis or Westlaw on its own. Nonetheless, the Court has obtained a copy of the Bay Machinery decision through the Eastern District of Arkansas's CM/ECF database. Because the plain language of the MTSA controls in this case, the Bay Machinery decision does not alter the Court's conclusion that the MTSA's limitation on cargo insurance does not limit SRT's liability for the loss of the pharmaceuticals in this case.

replacement value was $5,890,338.82. Id. at 34, 37–38, 43, 45–48, 50, 56, 63–64, 71–73. See also Pl.'s Statement of Undisputed Facts at ¶ 18, doc. 98. SRT has presented no evidence to rebut this calculation. Consequently, Exel is entitled to summary judgment as to Count IV of their Complaint in the amount of $5,890,338.82.

**IV.     Conclusion**

For the foregoing reasons, the Court GRANTS the Plaintiff's Motion for Summary Judgment (doc. 93) as to Count IV of the Complaint in the amount of $5,890,338.82 plus prejudgment interest and costs. The Court DISMISSES Count III of the Complaint and DENIES the Defendant's Motion for Summary Judgment (doc. 97).

IT IS SO ORDERED.

                                                              s/ James L. Graham
                                                              JAMES L. GRAHAM
                                                              United States District Judge

DATE:  August 26, 2014