**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Exel, Inc., f/u/b/o Sandoz, Inc.,                Case No. 2:10-cv-994

         **Plaintiff,**                        Judge Graham

    **v.**

                                              Magistrate Judge Abel

Southern Refrigerated Transport, Inc.,

         **Defendant.**

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion for Reconsideration (doc. 131). For the reasons that follow, the Court will DENY the Defendant's Motion.

## I.      Background

The Court's August 26, 2014 Opinion and Order (doc. 112) sets forth the background of the instant case. Relevant here, the Court's Opinion and Order (1) granted summary judgment to the Plaintiff on its state law breach of contract claim; (2) dismissed the Plaintiff's Carmack Amendment claim; and (3) denied the Defendant's motion for summary judgment. The Court entered judgment in favor of the Plaintiff in the amount of $5,890,338.82 plus prejudgment interest and costs.

Shortly thereafter, the Defendant filed a Motion to Stay Execution of Judgment (doc. 114). In its Motion, the Defendant requested that the Court stay execution of the judgment and waive the posting of a supersedeas bond. On December 5, 2014, the Court entered an Opinion and Order (doc. 130) directing the Defendant to file a supersedeas bond in the amount of $7,212,185.65 within 60 days of the Court's Order being filed. The Defendant subsequently filed

a Motion for Reconsideration (doc. 131), asking the Court to stay execution of the judgment and waive the posting of a supersedeas bond in light of new evidence submitted with its Motion.

## II.      Standard of Review

The court has authority under the Federal Rules of Civil Procedure and common law to reconsider interlocutory orders. See Fed. R. Civ. P. 54(b); In re Life Investors Ins. Co. of Am., 589 F.3d 319, 326 n. 6 (6th Cir. 2009). A party moving for reconsideration of an interlocutory order must demonstrate: "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." Rodriguez v. Tenn. Laborers Health & Welfare Fund, 89 F. App'x 949, 959 (6th Cir. 2004); see also Tenn. Protection & Advocacy, Inc. v. Wells, 371 F.3d 342, 348 (6th Cir. 2004).

## III.     Discussion

Based on new evidence submitted with its Motion, the Defendant argues that the Court should stay execution of judgment in this case and waive Federal Rule of Civil Procedure 62(d)'s supersedeas bond requirement. In support of its Motion, the Defendant submits a Parent Guaranty Agreement between itself and its parent company, Covenant Transportation Group (CVG). According to the Defendant, the Parent Guaranty Agreement "guarantees to [the Plaintiff] the prompt payment, when due, of any amount as may finally be determined by the Court as being owed to [the Plaintiff] by SRT after all appellate proceedings have been exhausted." Def.'s Mot. for Recons. at 4, doc. 131. The Defendant further emphasizes that CVG's ability to pay the judgment in this case is so plain that the cost of the bond would be a waste of money. The Defendant presents the Court with CVG's 2013 Form 10-K, 2014 third

quarter Form 10-Q, and November 2014 prospectus. These documents demonstrate that CVG has $685 million in revenue per year and stockholder equity of approximately $100 million.

In response, the Plaintiff argues that the Defendant still has not demonstrated "extraordinary circumstances" that would justify waiver of Rule 62(d)'s supersedeas bond requirement in this case. The Plaintiff argues that the Parent Guaranty Agreement is deficient because it is (1) unsecured and (2) devoid on its face of any consideration and consequently unenforceable. Concerning the unsecured nature of the Agreement, the Plaintiff emphasizes that "CVG is not offering any form of collateral to secure its guaranty obligation, which is worthless if CVG lacks the funds to satisfy the guaranty upon exhaustion of the appellate process in this case." Pl.'s Resp. at 5 n.3, doc. 133. The Plaintiff also reiterates its concerns regarding CVG's financial viability.

The Court agrees with the Plaintiff that the new evidence submitted by the Defendant does not demonstrate extraordinary circumstances that would justify waiving Rule 62(d)'s supersedeas bond requirement in this case. The primary purpose of Rule 62(d)'s bond requirement is to "protect[] the non-appealing party from the risk of a later uncollectable judgment." Hamlin v. Charter Tp. of Flint, 181 F.R.D. 348, 351 (E.D. Mich. 1998). The Defendant's Parent Guaranty Agreement does not serve this purpose because it treats the judgment in this case as an unsecured obligation. Absent some form of collateral, waiving the supersedeas bond requirement based on this Agreement would not protect the Plaintiff from the risk of a later uncollectable judgment.

The Court's concern regarding the Parent Guaranty Agreement is exacerbated by the financial condition of the Defendant's parent company, CVG. The Defendant emphasizes that CVG's annual revenue is approximately $685 million, which dwarfs the amount of the judgment

3

in this case and renders the bond requirement superfluous. In the Court's view, a company's revenue alone is insufficient to justify waiver of the bond requirement. A company with annual revenue of $685 million and annual liabilities of $650 million is in a significantly different financial position from a company with annual revenue of $685 million and annual liabilities of $700 million. The former may easily satisfy a multi-million judgment while the latter would likely be unable to satisfy such a judgment.

When evaluating a company's ability to satisfy a judgment, context matters. For 2013, CVG's total revenue was $684,549,000. 2013 Form 10-K at 35–36, doc. 131-2. It had total assets of $466,422,000, total liabilities of $366,062,000, $9,263,000 in cash on hand, and net income of $5,244,000. Id. at 35–36, 80, 86. CVG's unaudited 2014 third quarter 10-Q indicates that as of September 30, 2014, it had a net income of $4,263,000 and $17,234,000 in cash on hand. 2014 Form 10-Q at 6–10, doc. 131-3. These figures reflect that CVG is operating on the margins of profitability.

In addition, the risk factors identified by CVG in its financial documents do not inspire confidence in its ability to satisfy the judgment in this case should it be upheld on appeal. According to CVG:

> We have a recent history of net losses and may be unsuccessful in improving our profitability. We have generated a profit in only three of the last five years and our aggregate net losses during the five year period are significantly more than our aggregate net income. We may not be able to achieve profitability in the future, or if, we do, we may not be able to sustain or increase profitability in the future. If we are unable to improve our profitability, then our liquidity, financial position, and results of operations may be adversely affected.

2013 Form 10-K at 21. Further, CVG explained:

> We self-insure for a significant portion our claims exposure, which could significantly increase the volatility of, and decrease the amount of, our earnings. . . . Due to our significant self-insured amounts, we have significant exposure to fluctuations in the number and severity and the risk of being required to accrue or

pay additional amounts if our estimates are revised or the claims ultimately prove to be more severe than originally assessed. Further, our self-insured retention levels could change and result in more volatility than in recent years. Historically, we have had to significantly adjust our reserves on several occasions, and future significant adjustments may occur.

Id. Another significant risk factor identified by CVG is its ability to satisfy its obligations under

various financing agreements:

> Our Third Amended and Restated Credit Facility and other financing arrangements contain certain [obligations that] we may be unable to comply with[.] A default could result in the acceleration of all or part of our outstanding indebtedness, which could have an adverse effect on our financial condition, liquidity, results of operations, and the price of our common stock. We have a $95 million Credit Facility with a group of banks and numerous other financing arrangements. . . . We have had difficulty meeting budgeted results and have had to request amendments in the past.
>
> Certain other financing arrangements contain certain restrictions and non-financial covenants in addition to those contained in our Credit Facility. If we fail to comply with any of our financing agreements . . . we will be in default under the relevant agreement, which could cause cross-defaults under our other financing arrangements. In the event of any such default, if we failed to obtain replacement financing, amendments to, or waivers under the applicable financing arrangements, our lenders could cease making further advances, declare our debt to be immediately due and payable, fail to renew letters of credit, impose significant restrictions and requirements on our operations, institute foreclosure procedures against their collateral, or impose significant fees and transaction costs. . . . A default under our financing arrangements could cause a materially adverse effect on our liquidity, financial condition, and results of operations.

Id. at 23. In combination, these factors increase the risk that the Plaintiff may be unable to collect

on its judgment absent the Court requiring the Defendant to post a supersedeas bond.

### III.    Conclusion

For the foregoing reasons, the Court DENIES the Defendant's Motion for Reconsideration (doc. 131).

IT IS SO ORDERED.

5

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE:  January 23, 2015