# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**EXEL, INC. F/U/B/O SANDOZ, INC.,**

       Plaintiff,

**v.**

**SOUTHERN REFRIGERATED TRANSPORT, INC.,**

       Defendant.

**Case No. 2:10-CV-994**

**Judge Graham**

**Magistrate Judge Jolson**

## OPINION & ORDER

A truck filled with millions of dollars' worth of pharmaceuticals was stolen. The trucking company—Southern Refrigerated Transport, Inc. ("SRT")—is at fault. The shipper—Sandoz, Inc. ("Sandoz")—claims that the pharmaceuticals were worth $8.6 million. A federal statute— the Carmack Amendment, 49 U.S.C. § 14706 *et seq.*—imposes strict liability on motor carriers for "actual loss or injury to property," but a narrow exception applies if the shipper agrees to a limitation of liability. SRT argues that Sandoz drafted shipping documents called bills of lading in which it selected a liability limit of $2.40 per pound of cargo, or $56,766.36. The question before the Court is whether the bills of lading contain a valid limitation of liability.

Sandoz isn't a party to the lawsuit, but it assigned its claim to the company it hired to broker the shipment, Exel, Inc. ("Exel"). Exel thus brings this claim against SRT as the assignee of Sandoz. And on this claim, Exel and SRT both move for summary judgment. Since the purported limitation of liability does not satisfy the requirements placed on carriers by the Carmack Amendment, the Court will **GRANT** Exel's Motion for Summary Judgment on that issue and will **DENY** SRT's Motion for Summary Judgment. But the Court cannot grant summary judgment on the issue of damages because it lacks sufficient evidence to decide what measure of damages applies.

## I. Background

### A. Factual Background

The facts have been summarized many times throughout this case, most recently by the Sixth Circuit in its opinion vacating this Court's judgment and remanding the case for further proceedings. *Exel, Inc. v. S. Refrigerated Transp., Inc.*, 807 F.3d 140 (6th Cir. 2015). Before reciting the facts of this case, it's important to define a few terms that will be used throughout this discussion. There are three relevant parties: Sandoz, the pharmaceutical company; Exel, which brokered the shipment of Sandoz's goods; and SRT, which transported the goods by truck. Three terms apply to these parties throughout the discussion.

A "shipper" is "[s]omeone who ships goods to another." *Shipper*, *Black's Law Dictionary* (10th ed. 2014). Here, Sandoz is the shipper.

A "carrier" is "[a]n individual or organization (such as a shipowner, a railroad, or an airline) that contracts to transport passengers or goods for a fee." *Carrier*, *Black's Law Dictionary* (10th ed. 2014). Here, SRT is the carrier.

A "broker" is "[a]n agent who acts as an intermediary or negotiator, esp. between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation." *Broker*, *Black's Law Dictionary* (10th ed. 2014). More specifically to this context, "[t]he Interstate Transportation Act defines 'broker' as 'a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation.'" *Exel*, 807 F.3d at 149 n.7 (quoting 49 U.S.C. § 13102(2)). Here, Exel is the broker.

The Sixth Circuit recited the facts as follows:

> SRT is a motor carrier that provides transportation of cargo in interstate commerce. Exel, a freight broker, arranges for the transportation of its customer's commodities. In December, 2007, Exel and SRT executed a Master Transportation Services Agreement (MTSA). The MTSA is a standard agreement that Exel executes with any carrier it hires to transport its clients' goods. It establishes non-exclusivity, delineates various delivery terms, sets forth the billing arrangements and insurance requirements, and prescribes other terms that govern the parties' ongoing relationship. It does not contain shipment-specific terms.

Section 4 of the MTSA states that Exel will issue freight receipts for each shipment. Further, "[i]f a bill of lading[1] is issued as a freight receipt, any terms, conditions or provisions" in the bill of lading "shall be subject to and subordinate to the terms of" the MTSA, and "in the event of a conflict," the MTSA "shall govern." The MTSA also provides that SRT "shall be liable" to Exel for any "loss" to commodities shipped pursuant to the agreement, and that the "measurement of the loss . . . shall be the Shipper's replacement value applicable to the kind and quantity of Commodities so lost . . . ."

Sandoz, who is not a party to this litigation, is one of Exel's customers. In November, 2008, Exel arranged for SRT to transport a shipment of Sandoz's pharmaceuticals from Exel's warehouse in Mechanicsburg, Pennsylvania, to Memphis, Tennessee. Before the shipment, Exel prepared five documents, designated as bills of lading, on Sandoz's behalf. Exel personnel loaded the pharmaceuticals onto SRT's container. Exel personnel signed the bills of lading and gave them to the SRT driver, who also signed them.

The bills of lading include the number of units to be transported, the weight of each shipment, and special instructions for delivery. In the section labeled "KIND OF PACKAGES, DESCRIPTION OF ARTICLES SPECIAL MARKS EXCEPTIONS" the freight is designated as "Drugs or Medicines Non Hazardous." The freight is labeled "Item 60000 Class 85, RVNX $2.40." Neither of the latter terms is defined in the bills of lading.

The bills of lading contain the following "certification" language:

> Carrier, SFRI ... RECEIVED, *subject to the classifications and Tariff, in effect on the date of issue of this bill of lading* ... The Proper[sic] described below, in apparent good order, ... which said carrier ... agrees to carry ... that every service to be performed hereunder shall be subject to all terms and conditions of the Uniform Domestic Straight Bill of Lading ... in the applicable motor carrier classification or tariff[2] if this is a motor carrier shipment. *Shipper hereby certifies that he is familiar with all the said terms and conditions of the said bill of lading set forth in the classification or tariff which governs the transportation of this shipment and the terms and conditions are hereby agreed to by shipper and accepted by himself and his assigns.*

---

[1] "A bill of lading 'records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage.'" *Exel*, 807 F.3d at 150 (quoting *Norfolk S. Ry. v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 18–19 (2004)).

[2] "The Fourth Circuit has explained that [t]he term 'tariff,' even when still used by shippers and carriers out of habit, is now merely a contractual term with no effect apart from [its] status as a contract." *Exel*, 807 F.3d at 153 (quoting *ABB Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 138 (4th Cir. 2013)) (internal quotation marks omitted).

(Emphases added). The bills of lading also have a "declared value" box:

> NOTE–Where the rate is dependant [sic] on value, shippers are required to state specifically in writing the agree[sic] or declared value of property. The agreed or declared value on the property is hereby specifically stated by the shipper not to be not exceeding ___ per ___.

No value is declared on the bills of lading.

"RVNX" is not defined in the bills of lading. According to SRT, RVNX is an abbreviation for "Released Value Not to Exceed"—it is a per pound limit of liability for any claim against the carrier related to the loss or damage of the cargo, calculated by multiplying the per-pound limit of liability by the weight in pounds of the cargo.

On November 7, 2008, the SRT truck carrying the Sandoz shipment was stolen and the goods were never recovered. On November 14, 2008, Sandoz made a claim for the lost goods with Exel.

The November lost shipment was not the first cargo loss involving Sandoz, Exel, and SRT. Three months prior, on August 24, 2008, a SRT truck carrying Sandoz's cargo was stolen near Memphis, Tennessee, and the goods were never recovered. Exel submitted a written notice of claim to SRT pursuant to the MTSA, seeking full value recovery of the August shipment based on replacement cost for the shipment, which SRT paid (although the amount at issue was much less). Also after the August 24 theft, SRT allegedly agreed to assign Sandoz–Exel shipments to SRT's Constant Security Program (CSP), which requires that a truck never be left unattended. Exel admits that neither Exel nor Sandoz paid SRT for any special handling under the CSP, but maintains that "SRT apparently chose to absorb the cost of the CSP in order to keep" Exel's business.

Thus, on December 9, 2008, Exel submitted on behalf of Sandoz a claim to SRT pursuant to the MTSA demanding the full replacement value of the November shipment, $8,583,631.10. This time SRT denied the claim, stating that its recovery was limited to $56,766.36, based on the terms in the bills of lading, namely the "RVNX $2.40", times the weight of the cargo. In a letter dated January 29, 2009, Martin Gargiule, Director of Finance in Business Planning and Analysis Group for Sandoz, reiterated its position that "Sandoz holds Exel fully liable for the Claim, and demands payment for the claim in the amount of $8,585,631.10," and that "Sandoz therefore rejects Exel's position that it is not liable for the loss, or that Sandoz must look to the carrier for recovery."

On October 18, 2010, Sandoz assigned its rights and interests in the second lost cargo to Exel. On November 5, 2010, Exel, "for the use and benefit

of" Sandoz, filed a complaint against SRT, alleging (1) breach of contract (Count I); (2) breach of bailment (Count II); (3) breach of the ICC Termination Act (previously the Carmack Amendment) (Count III); and (4) a request for a declaratory judgment to determine "whether the terms of the Agreement or the terms of the bills of lading govern the claim for damages in this matter" (Count IV). Exel sought $8,583,671.12 in damages.

*Exel*, 807 F.3d at 143–45 (footnotes omitted).

## B. Procedural History

Exel presented four claims in its Complaint. Count I was for breach of contract. Count II was for breach of bailment. Count III was for breach of statutory duties under the Carmack Amendment. Count IV was for declaratory judgment.

The Court granted judgment on the pleadings for SRT on Counts I and II, declined to exercise jurisdiction over Count IV, and found that Count III presented a viable claim. (Doc. 24). The parties then submitted cross-motions for summary judgment as to Count III. (Docs. 29 & 30). After oral argument, and after hearing about the MTSA for the first time, the Court sua sponte reconsidered its decision and determined that Count IV stated a claim for breach of contract brought by Exel on its own behalf under the MTSA. (Op. & Order at 3, Doc. 49). The Court ordered supplemental briefing on the issue. (*Id.*). The Court then denied the parties' cross-motions for summary judgment without prejudice. (Op. & Order at 12–13, Doc. 59). At this stage, Counts III and IV were still viable, and the parties filed renewed cross-motions for summary judgment.

In August 2014, the Court granted summary judgment to Exel on Count IV, awarding it $5,890,338.82 in damages, which later increased to over $7 million with prejudgment interest. (Doc. 112). In doing so, the Court held that Exel's declaratory judgment claim was not preempted by the Carmack Amendment, which made it unnecessary to discuss Exel's claim under the Carmack Amendment (Count III).

The Court granted summary judgment to Exel because the parties had signed the MTSA, which apportioned liability amongst the parties with SRT bearing the loss if the goods were in its possession at the time of the loss. The MTSA measured the loss as "the replacement value applicable to the kind and quantity of Commodities lost." (MTSA at ¶ 9b, Doc. 97-6). Exel presented unrebutted testimony that the replacement value of the lost goods was $5,890,338.82, so the Court entered judgment for Exel in that amount plus prejudgment interest. (Op. and Order at 17).

SRT appealed the Court's grant of summary judgment on Count IV, and Exel filed a conditional cross-appeal of the dismissal of Count III. The Sixth Circuit held that Exel lacked standing to bring a breach-of-contract claim under the MTSA "because it suffered no injury and . . . the Carmack Amendment provides the exclusive cause of action in this case." *Exel*, 807 F.3d at 149. There was no evidence in the record to indicate that Exel was contractually liable to Sandoz for the lost pharmaceuticals; therefore, the lost pharmaceuticals were no loss to Exel, only Sandoz. Exel had no standing of its own, regardless of the MTSA, to sue SRT for the lost pharmaceuticals. Since Count IV was the basis for the damages award, the Sixth Circuit vacated that award. Exel can no longer maintain its own breach-of-contract claim under Count IV of its Complaint.

In Exel's conditional cross-appeal, it first argued that even if the Carmack Amendment applied to its claim, the Carmack Amendment permits it to enter into a contract with a carrier and have that contract assign liability. The MTSA is that contract. The Sixth Circuit rejected this argument, holding that "only a 'shipper and a carrier' can enter into an agreement waiving rights under the statute." *Id.* at 149 (quoting 49 U.S.C. § 14101(b)(1)). "[T]he Carmack Amendment does not provide Exel, as a non-shipper broker, with a direct cause of action. Thus, Exel cannot sue under the Carmack Amendment for breach of the MTSA." *Id.*

But the Sixth Circuit did return one claim to the district court: Exel's assigned claim from Sandoz. The Sixth Circuit held that Sandoz had a claim "against SRT under the bills of lading," Sandoz assigned that claim to Exel, and "as assignee of those rights, Exel has standing to bring a Carmack claim." *Exel*, 807 F.3d at 149. After some discussion, the Sixth Circuit narrowed the issue on remand to this: "whether SRT's liability is effectively limited in the bills of lading." *Id.* at 151. That question turns on two issues: (1) the meaning and significance of the phrase "RVNX $2.40," in the bills of lading and (2) whether SRT "provided Sandoz (or Sandoz's agent) with the opportunity to choose between two or more levels of liability as required by *Toledo Ticket*." *Id.* (referring to *Toledo Ticket Co. v. Roadway Exp., Inc.*, 133 F.3d 439, 442 (6th Cir. 1998)). The Sixth Circuit concluded, saying "[i]n sum, whether SRT's liability is limited by the bills of lading is a question of fact, for resolution in the first instance by the district court." *Id.* at 153.

The Sixth Circuit also noted another issue not fully ripe for its review:

Exel also argues that, even if the bills of lading trump the terms of the MTSA, the limitation of liability in the former would be invalid due to SRT's breach of the CSP [Constant Security Program], which the driver violated by leaving the

vehicle unattended immediately prior to the loss. . . . The district court did not address this issue and the record is not sufficiently developed at this point for us to consider it. We note only that Exel did not sue SRT for breach of a separate CSP agreement and Exel admits that neither Exel nor Sandoz paid for any special handling under the CSP.

*Id.* at 154 n.15.

On remand, Exel moved to amend its Complaint to "reflect the current state of the pending causes of action." (Pl.'s Mot. Leave to File Am. Compl. at 3, Doc. 149). The Court denied Exel's motion:

> Insofar as the proposed amendments may be construed as an attempt to assert new claims based upon the Master Transportation Services Agreement ("MTSA"), they would be inappropriate because any such claims would be precluded by the Sixth Circuit's decision that Exel has no independent rights under the MTSA. *Exel, Inc. v. S. Refrigerated Transp., Inc.*, 807 F.3d 140, 148 (6th Cir. 2015) ("Exel does not have standing to sue for breach of contract damages under the MTSA."). Insofar as the amendments may be construed as an attempt to assert an argument opposing an affirmative defense, based on SRT's Constant Security Program ("CSP"), they are unnecessary. The question before the Court is "whether SRT's liability is limited by the bills of lading." *Id.* at 153. SRT argues that the bills of lading contain a valid limitation of its liability. (Def.'s Mem. in Support of Mot. for Summ. J. at 16–31, doc. 153-2). Exel argues, among other things, that SRT materially deviated from the terms of its CSP, which requires 24-hour security for the cargo. Exel argues that SRT's failure to follow the agreement is a deviation that nullifies any valid limitation of liability in the bills of lading. (Pl.'s Mem. in Support of Mot. for Summ. J. at 15-17). Now, Exel seeks to amend its complaint to add allegations concerning the CSP but not to add a separate claim for breach of the CSP.

> Exel's failure to refer to the CSP agreement in its complaint does not preclude it from arguing that a material deviation from the CSP nullifies SRT's limitation of liability under the bill of lading (or, as Exel once described it, asserting "essentially an affirmative defense to an affirmative defense."). (Tr. of Oral Argument, 9:12, May 14, 2014). SRT has waived any argument that Exel was required to refer to the material-deviation doctrine in the complaint. SRT never argues that failing to plead what Exel now seeks to plead bars the argument Exel makes, and SRT has not cited any provision of the Federal Rules of Civil Procedure which would require Exel to so plead. (See Def.'s Mem. in Support of Mot. for Summ. J. at 35–39, doc. 153-2). Before the end of discovery, SRT was put on notice that Exel would assert the CSP to recover the full value of the shipment, and SRT is not prejudiced by Exel's failure to refer to the CSP in its complaint.

(Order Denying Mot. Leave File Am. Compl. at 1–2, Doc. 160).

Exel and SRT then filed cross-motions for summary judgment. Exel argues that the Carmack Amendment places full liability for the stolen shipment on the carrier, SRT. Additionally, Exel argues that even if SRT limited its liability through the bills of lading, SRT's breach of the CSP was material; therefore, any limitation of liability is void. SRT argues that the bills of lading limit its liability on the lost cargo to $56,766.36. SRT opposes Exel's attempted use of the material-deviation doctrine to invalidate the limitation on SRT's liability. Finally, SRT argues that even if the bills of lading don't limit its liability, Sandoz's damages are the replacement cost of the stolen pharmaceuticals, which it argues are $2.4 million rather than $5.9 million.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To survive summary judgment, the party opposing summary judgment "must present more than a mere scintilla of evidence in support of [its] position." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). In a case such as this where the Court evaluates cross-motions for summary judgment, summary judgment is "not necessarily appropriate solely because the parties filed" opposing motions. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001). But the Court may rule "that one party sufficiently demonstrated that no genuine issue of material fact existed." *Id.*

## III. Discussion

The parties' motions raise four questions: (1) Do the bills of lading effectively limit SRT's liability under the Carmack Amendment? (2) Is the $2.40 per-pound limit of liability reasonable under the circumstances surrounding the transportation? (3) Does the material deviation doctrine require the Court to nullify the liability limitation? (4) What measure of damages should the Court apply? At the summary judgment stage, the Court analyzes whether a trial is required on any of these questions or whether they can be answered as matters of law. The

Court's answer to the first question makes an answer to the second and third questions unnecessary. The fourth question requires more evidence for the Court to provide an answer.

### A. The Bills of Lading Do Not Limit SRT's Liability

The only claim the Sixth Circuit returned to the Court was Sandoz's claims against SRT brought under the bills of lading. Sandoz assigned these claims to Exel. Those claims are governed by the Carmack Amendment.

The Carmack Amendment makes carriers liable "to the person entitled to recover under the receipt or bill of lading" for the "actual loss or injury to the property" of the shipper. 49 U.S.C. § 14706(a)(1). Full liability on the carrier is the "'default posture' of the Carmack Amendment." *Exel*, 807 F.3d at 150. However, the Carmack Amendment permits carriers "to establish rates for the transportation of property . . . under which the liability of the carrier for such property is limited." 49 U.S.C. § 14706(c)(1)(A). Carriers must comply with several requirements to limit their liability. The value of the cargo must be "established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." *Id.* The carrier must "provide . . . to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based." § 14706(c)(1)(B).

Expounding upon these statutory requirements, the Sixth Circuit has held that a carrier must do four things to limit its liability: "(1) maintain approved tariff rates with the ICC [the Interstate Commerce Commission]; (2) provide the shipper with a fair opportunity to choose between two or more levels of liability; (3) obtain the shipper's written agreement as to its choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment." *Exel*, 807 F.3d at 151 (citing *Toledo Ticket Co. v. Roadway Exp., Inc.*, 133 F.3d 439, 442 (6th Cir. 1998)). The carrier bears the burden of establishing that it met these requirements. *Toledo Ticket*, 133 F.3d at 442.

Analyzing this case under the *Toledo Ticket* framework, the Sixth Circuit noted factual issues pertaining to the reasonable opportunity requirement that precluded summary judgment: it wasn't clear what classification or tariff governed the stolen Sandoz shipment, and it wasn't clear whether the bills of lading effectively limit SRT's liability. The resolution of the first factual issue sheds light on the second.

On the first issue—the classification or tariff governing the stolen Sandoz shipment—the Sixth Circuit noted that, "SRT does not explain what 'classification or tariff ... govern[ed]' the November 7 shipment, or indicate whether it made this information available to Sandoz, upon the shipper's request." *Exel*, 807 F.3d at 152. While Congress eliminated the requirement that carriers file their tariff with the ICC, *id.* at 151 (citing Trucking Industry Regulatory Reform Act of 1994, Pub. L. No. 103–311, § 206, 108 Stat 1673, 1684–85 (codified as amended as 49 U.S.C. §§ 10702, 10762(a)(1) (1994)), Congress "added the subsection that requires carriers to 'provide to the shipper, *on request of the shipper,* a written or electronic copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based.'" *Exel*, 807 F.3d at 151 (quoting 49 U.S.C. § 13710(a)(1)). The Carmack Amendment required SRT to provide its tariff to Sandoz on Sandoz's request.

The applicable tariff is now in the record, (*see* Rates/Rules Tariff No. 1, Doc. 155-13), but Sandoz never requested the tariff or a "copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based." *Exel*, 807 F.3d at 150. Therefore, SRT was not required to provide Sandoz a copy of the tariff.

But, just because SRT didn't have to provide its tariff to Sandoz doesn't relieve SRT of its responsibilities under *Toledo Ticket*. Specifically, the Sixth Circuit observed that the "'reasonable opportunity' requirement survives the 1995 revisions to the Carmack Amendment and therefore does not undermine *Toledo Ticket*'s core holding that the carrier must give a shipper a fair opportunity to choose between levels of liability." *Exel*, 807 F.3d at 152 (noting the court's agreement with the Eleventh and Fourth Circuits). This is the heart of the issue that the Sixth Circuit identified: did SRT provide Sandoz with a fair opportunity to choose between two or more levels of liability?

The Sixth Circuit's opinion identified evidence in each party's corner. In Sandoz's favor—that is, in favor of finding that the bills of lading do not limit SRT's liability—the court observed that "while the bills of lading allow the shipper to declare a value, they do not offer an option to choose a higher level of coverage or state that the carrier's liability might be limited." *Id.* at 152–53. Neither does SRT's tariff. It only says that SRT's liability won't exceed $100,000. (Rates/Rules Tariff No. 1 at Item 3.1). With no other evidence that Sandoz had a reasonable opportunity to choose between levels of liability, SRT's argument seems dead in the water. But

there's a critical piece of evidence in SRT's corner: Sandoz (through its agent, Exel), drafted the bills of lading that includes the purported liability limiting phrase, "RVNX $2.40."

> On the other hand, the bills of lading at issue were drafted *by the shipper*, Sandoz (actually the shipper's representative, Exel), a "sophisticated business entit[y]" in the shipping business. Sandoz not only "certif[ied]" that it was "familiar with" and "agreed to" all the said terms and conditions of the said bill of lading set forth in the classification or tariff which governs the transportation of this shipment," but inserted the terms "Item 60000 Class 85, RVNX $2.40," and did not declare a value in the declared value box. Although not dispositive in the Carmack Amendment context, the fact that the shipper drafted the bills of lading is relevant in ascertaining whether the shipper was offered, and agreed to, a limitation of liability by the carrier. In sum, whether SRT's liability is limited by the bills of lading is a question of fact, for resolution in the first instance by the district court.

*Id.* at 153 (citations omitted).

But what's the Court to make of the term Sandoz included in the bill of lading: "ITEM 60000 CLASS 85 RVNX $2.40"? According to SRT, "'ITEM 60000 CLASS 85' . . . refers to the category of freight as defined by the National Motor Freight Traffic Association." (McEntire Aff. at ¶ 9, Doc. 153-4). And "RVNX" is an abbreviation of the phrase "Released Value Not to Exceed," which designates "a per pound limit of liability of any claim against the carrier in the event that the cargo is lost or damaged in transit." (*Id.* at ¶ 10).

According to Exel, the term "Item 60000 Class 85 RVNX $2.40" is only a warehouse code—a freight classification programmed into Exel's computer that automatically prints onto the freight receipts it generates when "Exel identifies the type of cargo being transported." (Hecker Aff. dated Feb. 23, 2012 at ¶ 16, Doc. 155-10). Exel contends that "[t]here is no declaration of the value of the property on the freight receipt since the freight rate is not dependent upon value. . . . That is, a flat rate is charged for the truckload, rather than based upon weight or value." (*Id.* at ¶ 17). The parties did not dispute the industry meaning of the term RVNX $2.40; they only dispute its significance in this context.

The fact that Sandoz drafted the bills of lading which include the term "RVNX $2.40" is "not dispositive," but it is "relevant" to the question of whether SRT satisfied the reasonable-opportunity requirement. *Exel*, 807 F.3d at 153.

In most of the cases involving shipper-drafted bills of lading, the shipper gets stuck with the liability limit it chooses because the shipper either negotiated for a lower shipping rate, or it knew it would get a discount on the full freight rate if it assigned a lower released value. *See, e.g.*, *Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1273 (11th Cir. 2001) ("Siren knew

'Class 85' determined the freight rate charged, and Siren knew that it received a 62% discount from Estes' full freight rate."); *ABB Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 144 (4th Cir. 2013) (agreeing with *Siren*'s reasoning, but finding that, because "the [bill of lading] is entirely silent regarding any current rate, classification, or other specific authority governing the shipment[, and t]here also is no evidence that the parties had a written agreement establishing a limit of liability separate from the BOL . . . we decline to conclude that a shipper should be held to notice of a privately held price list based only on generic and ambiguous language referencing a 'tariff' or 'classification.'") (footnote omitted); *Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 612 (9th Cir. 1992) (shipper had reasonable opportunity where it had "reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting [carrier's] liability limit because it drafted the contract and directly negotiated its terms."); *F.M. Mach. Co. v. R & L Carriers, Inc.*, No. 5:08-CV-2358, 2009 WL 1759577, at *3 (N.D. Ohio June 16, 2009) ("The rationale supporting *Toledo Ticket* is missing when examining a case in which the shipper has drafted the bill of lading."). The reasonable opportunity requirement is based on the principle of notice and choice—only when a shipper has "a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." *N.Y., N. H. & H. R. Co. v. Nothnagle*, 346 U.S. 128, 135 (1953). Conversely, where a carrier charges a flat contract amount, the shipper has no "opportunity to choose between paying a low rate and assuming more liability, or paying a higher rate and placing risk of loss on the carrier." *First Nat. Bank & Trust Co. of Newtown v. Consol. Freightways*, 797 F. Supp. 1262, 1273 (E.D. Pa. 1992), *on reconsideration* (July 24, 1992).

The structure and exact language of the bills of lading are important facts when analyzing the reasonable opportunity requirement. Some courts hold that a "declared value box [on a bill of lading] provides the reasonable opportunity to choose a higher level of liability, and the shipper's expectation that the carrier would be fully liable for any potential loss despite a failure to declare the actual value of the shipment is not more than a unilateral mistake." *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 842 (11th Cir. 2003) (discussing carrier-drafted bill of lading). In these cases, courts will enforce "a provision in a tariff which limits liability to a certain amount absent a declaration of value in the bill of lading." *Id.* This implies that the tariff describes an option to change the limit of liability if a shipper declares a value.

Here, the bills of lading provide a space to declare value. The instructions say: "NOTE-where the rate is dependant [sic] on value, shippers are required to state specifically in writing the agree [sic] or declared value of property. The agreed or declared value on the property is hereby specifically stated by the shipper to be not exceeding _____ per _____." (Bills of Lading, Doc. 97-8). While Exel did not fill in the blanks provided in its own bill of lading, it did include the term "RVNX $2.40" in the box above, which states exactly the information the bill of lading requests in the declared value box. And while "RVNX $2.40" is a phrase from the nomenclature of declared value, that information only matters if the rate depends on value, per the bills of lading. And here, Exel and SRT negotiated a flat rate apart from the bills of lading. (*See* Truckload Pricing Request, Doc. 97-3). Sandoz and SRT had no negotiations over rates. The rate for the Sandoz shipment did not depend on value.

Furthermore, even though Exel certified that it was familiar with the applicable tariff, that tariff does not establish a rate schedule for varying levels of liability. It caps SRT's liability at $100,000 and does not provide shippers the option of paying more for a higher limit or less for a lower limit. The Carmack Amendment permits carriers to "*establish rates* for the transportation of property . . . under which the liability of the carrier for such property is limited." 49 U.S.C. § 14706 (c)(1)(A) (emphasis added). Here, SRT established no rates under which its liability would be limited for the Sandoz shipment. Without applicable rates, there can be no corresponding limit of liability.

By including "RVNX $2.40" in the bill of lading it drafted, Exel provided the information that could declare a released value. But there's one problem: the rate didn't depend on the value it declared. In fact, SRT didn't offer rates, in its tariff or otherwise. Since the rate didn't change based on the value Sandoz declared, Sandoz wouldn't get a discount on the freight rate by opting for a lower released value. And this exchange is at the heart of the reasonable opportunity requirement. And where "neither the tariff nor the bill of lading tell the shipper where on the bill of lading it can request more coverage," *Sassy Doll*, 331 F.3d at 842, the reasonable opportunity requirement isn't satisfied. Therefore, since in this case "RVNX $2.40" is not a valid limitation of liability, SRT is liable to Exel for the stolen shipment without any limitation of liability.

This result may seem harsh. Indeed, "[t]he result might well be different if the tariff indicated where on the bill of lading the shipper should indicate its request for excess liability

coverage." *Id.* at 843. Furthermore, the parties assumed that the MTSA, and not the bills of lading, dictated liability at the time the bills of lading were drafted and signed. Exel argues that the bills of lading are just freight receipts. This may be true, but if they're just freight receipts, then can Sandoz bring a claim at all? The Sixth Circuit said it could, and the Sixth Circuit left this Court to answer the question of whether the bills of lading contain a valid limitation of liability. Under the Carmack Amendment, the bills of lading are what matter, whether they're called bills of lading or freight receipts. *See* 49 U.S.C. § 14706 (a)(1) ("[C]arrier [is] . . . liable to the person entitled to recover under the receipt or bill of lading.").

**B. The Material Deviation Doctrine Does Not Apply**

While the bills of lading do not limit SRT's liability, if they did, the material deviation doctrine would not nullify the limitation. Exel argues that the "material deviation doctrine" nullifies liability limitations when a carrier agrees to provide special security for a shipment, the shipper pays for the special security measures, and the carrier doesn't do what it said it would do. Exel argues that SRT's driver materially deviated from the agreed special shipping provisions—the Constant Security Program ("CSP")—when he left the truck and took a restroom break only to return to find the truck gone. Here's exactly what happened.

On August 24, 2008 a shipment of Sandoz medical supplies and pharmaceuticals was stolen near Memphis, Tennessee while being transported by SRT. (Joint Stip. Facts at ¶ 3, Doc. 155-22). After this first theft, Exel sent SRT a "Corrective or Preventative Action (CAPA) Request" that served the purpose of "both a root cause analysis exercise, as well as to ensure steps were going to be put into place in efforts to prevent similar losses." (Michel Aff. at ¶ 6, Doc. 94-5).

The CAPA is a form sent by Exel to SRT with an explanation of the problem and a request for suggestions of solutions. The CAPA form indicated it was "Preventative," it arose from a claim for theft or pilferage, and Exel included in it a detailed description of the incident. (Ex. A to Michel Aff.). The CAPA form required SRT to respond by October 8, 2008, brought the incident to SRT's attention "for immediate Corrective or Preventative Action," and requested a root cause investigation, mitigating actions, and corrective or preventative actions. (*Id.*). Attached to the CAPA form is a thorough description of SRT's security protocols, including its "Constant Security Requirements." (*Id.*). The Constant Security Requirements are:

1. Never leave the truck unattended. If you are a solo, find someone to watch your truck.
2. If you are asked to contact Dispatch, do so as soon as possible. Some Shippers have specific requirements that need to be discussed in detail.
3. Always have a padlock and a seal.
4. Fill tanks with fuel before pick-up. If not at least half full and fuel route does not support this, contact the Fuel Department directly and explain the situation.
5. No unnecessary stops for 200 miles after leaving shipper or within 60 miles of receiver.
6. Where there is significant time between pick-up and delivery, you will be routed through a terminal where security for you and the cargo can be assured.
7. If you are not routed through a terminal, you are expected to spend time in an area that is as secure as possible. It must be well lit or secure.
8. Never discuss with anyone what you are hauling.
9. Whenever stopping for any reason, send a Macro 34 "CONSTANT SECURITY" stating:
    a. Why you are stopping (fuel, scaling, eating, etc.),
    b. Where exactly you are, including name of establishment and exit number,
    c. How long you expect to be stopped, and
    d. That you are back on the road.

(Ex. A to Michel Aff.).

The CAPA form does not indicate whether it was accepted or rejected, but the parties don't dispute that SRT agreed to implement the CSP for the Exel/Sandoz shipments.

Nowhere in the CAPA form or other correspondence has the Court discovered a communication to SRT that Exel would stop shipping with SRT if SRT did not put the Exel/Sandoz shipments on the CSP. Exel's employee involved in completing the CAPA form states in his affidavit that "had SRT not agreed to take additional security measures to the satisfaction of EXEL, the Sandoz/EXEL traffic business would have been pulled and terminated." (Michel Aff. at ¶ 9). But he does not state that this intention was ever communicated to SRT. Some SRT employees indicated they thought that losing the Exel business was a risk, but they never indicated receiving a threat or promise from Exel. (*See* SRT Ex. H, Reinholdt Dep. at 19:23–20:1, Doc. 153-11; SRT Ex. F, Brown Dep. at 15:22–16:9, Doc. 153-9 ("[D]oes anyone at SRT have knowledge with respect to whether Sandoz/Exel were going to pull the business in the event that satisfactory constant security requirements were not provided and agreed to? . . . [Answer:] Best I can say was I would presume that that was why we were doing this.")).

After the CAPA form was completed and returned and SRT agreed to put the Sandoz/Exel shipments under the CSP, a second shipment was stolen. SRT's truck driver violated the CSP by leaving the shipment unattended. This case is about the second theft.

The material deviation doctrine comes from admiralty law. *KLLM, Inc. v. Watson Parma, Inc.*, 634 F. Supp. 2d 699, 707–08 (S.D. Miss. 2009). As this Court and others have noted, extending the material deviation doctrine to regulated interstate commerce is an issue that is "far from settled." *Id.* Most courts hold that the material deviation doctrine does not apply to Carmack Amendment cases. *See Rocky Ford Moving Vans, Inc. v. United States*, 501 F.2d 1369, 1372 (8th Cir. 1974) ("[A]dmiralty law doctrine has no application in the context of regulated interstate commerce, which is governed by the overriding federal policy of uniformity."); *Kan. City Fire & Marine Ins. Co. v. Consol. Rail Corp.*, 80 F. Supp. 2d 447, 451 (E.D. Pa. 1999). The courts that have applied the doctrine to the Carmack Amendment apply the doctrine in limited situations.

> [W]here the shipper paid an additional charge to ensure specialized safety measures to reduce the risk of damage to its cargo, the carrier's failure to perform those very measures which resulted in damage to the cargo has been found to be a sufficient basis upon which the liability limitation provision in the shipping agreement may be rescinded.

*Praxair Inc. v. Mayflower Transit, Inc.*, 919 F. Supp. 650, 656 (S.D.N.Y. 1996). This isn't settled law in the Sixth Circuit. The Sixth Circuit's most extensive discussion of the issue appears to be in a footnote in its opinion in this case.

> The "material deviation" doctrine provides that where the shipper has paid an additional charge for special shipment provisions to reduce the risk of damage and the carrier fails to perform those very measures, resulting in damage to the cargo, the shipper is not bound by the contract and the limited liability provision may be rescinded. The district court did not address this issue and the record is not sufficiently developed at this point for us to consider it. We note only that Exel did not sue SRT for breach of a separate CSP agreement and Exel admits that neither Exel nor Sandoz paid for any special handling under the CSP.

*Exel*, 807 F.3d at 154 n.15 (citing *Praxair*, 919 F. Supp. at 656).

In this Court, Judge Smith has twice been asked to apply the material deviation doctrine in the Carmack Amendment context; twice he discussed it but declined to apply it to nullify a limitation of liability. *See Tokio Marine & Nichido Fire Ins. Co. v. Flash Expedited Servs., Inc.*, No. 2:12-CV-1057, 2013 WL 4010312, at *8 (S.D. Ohio Aug. 6, 2013) ("The lack of any additional safety measures, combined with the fact that no additional consideration was paid,

results in no application of the 'material deviation' doctrine in this case."); *The Ltd., Inc. v. PDQ Transit, Inc.*, 160 F. Supp. 2d 842, 845 (S.D. Ohio 2001) ("There was no higher fee paid for this service so *Praxair* is not applicable here.").

To the extent this Court has recognized the viability of the material deviation doctrine in the Carmack Amendment context, it has done so narrowly, only where a shipper provides additional consideration for additional security measures. The Court believes that consideration shouldn't be limited to currency. If a party bargains for heightened security and doesn't receive it, the material deviation doctrine should apply. But here, consideration is lacking.

Exel never paid SRT to implement the CSP for the Sandoz/Exel shipments. But Exel argues that by keeping its business with SRT it supplied additional consideration, and by adding the CSP to the Sandoz shipments, SRT was discounting the plain freight rate and accepting additional consideration for the CSP. So if, "[c]onsideration may consist of either a detriment to the promisee or a benefit to the promisor," *Williams v. Ormsby*, 131 Ohio St. 3d 427, 430, 2012-Ohio-690, ¶ 16, 966 N.E.2d 255, 259, and "a detriment may consist of some . . . forbearance . . . undertaken by the promisee," *id.*, then consideration is present because Exel could have pulled the business but didn't.

It's unclear whether SRT incurred any additional cost to put the Sandoz/Exel shipments under the CSP. SRT did not place all shipments under the CSP. (Brown Dep. at 35–36). One of SRT's employees, Clifford Brown[3], stated in his deposition that SRT incurred some additional costs to implement the CSP, but SRT did not pass the cost along to Exel, instead choosing to "eat the cost." (Brown Dep. at 16:23–17:6). SRT has since refuted its own employee's testimony with the affidavit of another of its employees, Rodney Danley[4], who states that "SRT did not incur or absorb any incremental costs associated with placing Sandoz shipments in the CSP." (Danley Aff. at ¶ 21, Doc. 153-6). Exel argues that SRT is just trying to change facts that hurt its case; SRT counters that Rodney Danley, and not Clifford Brown, was the individual with knowledge of the costs of implementing the CSP for the Sandoz/Exel shipments.

The Court resolves this issue without resolving the factual dispute noted above. Exel made no promise and suffered no detriment; accordingly, SRT made a promise but received no benefit in exchange. Exel says now that it would have pulled the Sandoz business but for the

---

[3] Clifford Brown is the Director of Risk Management for SRT. (Brown Dep. at 4:20–22).
[4] Rodney Danley is the Director of Pricing at SRT. (Danley Aff. at ¶ 1).

implementation of the CSP after the First Theft, but that intention remained unspoken at the time. The CAPA form contained no language threatening to cease business with SRT if it did not put all Sandoz shipments on the CSP, nor did it contain language promising to provide—contingent upon SRT satisfactorily completing the CAPA form—any additional business to SRT. And as such, even after SRT promised to put the Sandoz/Exel shipments on the CSP, Exel was not bound to keep shipping the Sandoz business with SRT. Thus, Exel—the promise—suffered no detriment; SRT—the promisor—received no benefit. *See Williams*, 131 Ohio St. 3d at 430.

The material deviation doctrine may operate to nullify a limitation of liability defense in the Carmack Amendment context. But under these facts, without clear, separate consideration passing from the shipper to the carrier in exchange for the additional security, the doctrine would not apply.

### C. The Court Cannot Rule on the Proper Measure of Damages

Since the bills of lading don't limit SRT's liability, the Court moves to the question of damages. Exel argues that it is entitled to recover the market value of the stolen pharmaceuticals: $8,583,631.10. SRT argues that Sandoz sent a replacement shipment to its customer, so it lost no sales and no profits; therefore, Sandoz is only entitled to recover the replacement value of the stolen shipment: about $2.4 million. Exel counters that even if the Court determines that the proper measure of damages is replacement value and not market value, the replacement value is $5,890,338.82. Since there's very little evidence on the question of whether Sandoz lost any sales, the Court will deny summary judgment on this issue.

Determining the proper measure of damages is generally a question of law. *Houmani v. Roadway Express, Inc.*, No. 3:07-CV-1552, 2008 WL 731497, at *1 (N.D. Ohio Mar. 17, 2008) (citing *Dorris v. Absher*, 179 F.3d 420, 426–27 (6th Cir. 1999) (analyzing proper measure of damages under wiretapping statute)). But this question often turns on key facts, which can make it inappropriate to grant summary judgment. *See, e.g.*, *Delta Research Corp. v. EMS, Inc., an Ohio corporation*, No. 04-60046, 2005 WL 1981775, at *5–7 (E.D. Mich. Aug. 16, 2005) (determining measure of damages as a matter of law but identifying factual dispute on the amount of damages).

The measure of damages under the Carmack Amendment is "actual loss or injury." 49 U.S.C. § 14706(a)(1). The general rule is that "'actual loss' is the market price of the shipped item at the point of destination." *Houmani*, 2008 WL 731497, at *1 (citing *Eastman Kodak Co.*

*v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319 (10th Cir. 1991); *see also L.A. Enterprises, Inc. v. Roadway Exp., Inc.*, 2006 WL 1129389, *2 (E.D. Tenn. April 24, 2006)). This rule "may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable." *Illinois Cent. R. Co. v. Crail*, 281 U.S. 57, 64–65 (1930). One alternative measure of damages is replacement cost.

Replacement cost is the proper measure of damages if a shipper "secured substitute goods after the accident, lost no sales, and had no opportunity for a sale with these damaged goods." *Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir. 1990); *accord Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118, 1120 (9th Cir. 2000) ("Replacement cost is an appropriate measure of damages where the injured party could mitigate the loss by replacing the goods."); *Meletio Sea Food Co. v. Gordons Transports*, 191 S.W.2d 983, 986 (Mo. App. 1946); *see also Eastman Kodak*, 949 F.2d at 319–20 (finding that special reasons didn't exist where carrier failed to show that shipper couldn't "have sold and earned profit on two batches of unharmed product."). Some courts place the burden on the carrier to prove that special reasons exist to depart from the market-value rule. *See, e.g.*, *Eastman Kodak*, 949 F.2d at 319. In short, these cases stand for the uncontroversial rule that if the shipper was able to replace the shipment and not lose any sales, lost sales aren't included when calculating "actual loss."

Exel makes another argument for why replacement cost shouldn't be the measure of damages: "[h]ijacked goods, unlike those destroyed, ultimately compete with the manufacturer and, therefore, no true replacement is possible." *Polaroid Corp. v. Schuster's Exp., Inc.*, 484 F.2d 349, 351 (1st Cir. 1973). Here the goods were stolen. But here, Exel offers no proof that the stolen pharmaceuticals would compete in the same market as Sandoz's pharmaceuticals. Perhaps some of the drugs would be resold for their intended use; perhaps others would be resold for other uses. But the Court can do nothing but speculate about those possibilities. In contrast, the *Polaroid* court had the benefit of affidavits that "established a more than reasonable likelihood that the hijacked goods would have been sold at the claimed market price." *Id.* at 352. Even if the First Circuit's decision in *Polaroid* controlled, Exel hasn't offered any evidence that the stolen drugs would compete in the same market as Sandoz. The Court rejects Exel's argument on this point.

To determine what measure of damages to apply, the Court must analyze whether Sandoz lost any sales. Neither side offers conclusive evidence on this point.

SRT states that the fact that Sandoz lost no sales is "undisputed." (SRT's Resp. at 33, Doc. 161). The Court sees a hazier picture. SRT claims that Sandoz's sales director testified that he was "very confident" that Sandoz was able to deliver replacement pharmaceuticals to its customer, (*Id.* at 32 (citing Gargiule Dep. at 5–6, 114–15)), but the Court hasn't located the cited language from the Gargiule deposition in the record.[5] SRT also points to emails from Sandoz indicating that the "replacement order for [the customer] was placed yesterday . . . ." (SRT's Resp., Ex. A at PageID 4454, Doc. 161-2). SRT's evidence is extremely thin and far from conclusive. In fact, the only piece of evidence in the record seems to be an unauthenticated, uncorroborated, and unexplained email—hardly firm ground on which to base a multi-million dollar decision.

Sandoz hasn't done much more. Sandoz could produce evidence that it wasn't able to replace the shipment. Sandoz could prove its losses if it wasn't able to replace the shipment or if it was able to replace the shipment but at a discount. Sandoz hasn't provided proof that it lost sales.

If this case were in the Tenth Circuit, SRT would be liable for market value because it has failed to bear the burden of proving that Sandoz lost sales. *See Eastman Kodak*, 949 F.2d at 319 (10th Cir.); *accord Travelers*, 2000 WL 900482 (D. Or.) (collecting cases). But some courts analyze nearly identical statutes and require a plaintiff to provide "sufficient evidence to show that it actually lost sales because Defendant failed to deliver the goods." *Levi Strauss & Co. v. Sea-Land*, No. 00-CIV-7585, 2003 WL 21108311, at *2 (S.D.N.Y. May 15, 2003) (analyzing the Carriage of Goods by Sea Act ("COGSA")). Sandoz hasn't done that. If the burden is on SRT to prove that Sandoz lost sales thus justifying a departure from the market-value rule, then SRT likely loses on this issue. On the other hand, placing the burden on SRT implies that a rebuttable presumption applies in favor of the market-value rule. And while the market-value rule is the norm in Carmack Amendment cases, it is still only the usual way to measure "actual loss," which is the statutory standard for damages. 49 U.S.C. § 14706 (a)(1). Furthermore, Carmack-Amendment plaintiffs must prove their damages as part of their prima facie case. *Mo. Pac. R.*

---

[5] The excerpts provided by Exel include 31 pages of the Gargiule deposition. (*See* Ex. to Pl.'s Mot. File Doc. Under Seal, Doc. 100-2).

*Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964). Here, to grant summary judgment, the Court must determine that Sandoz actually lost sales. There is a genuine dispute of that material fact (and a genuine lack of facts), so summary judgment is inappropriate.

The Court must decide what measure of damages to apply as a matter of law. But whether Sandoz lost any sales is a factual issue that the Court must resolve on its way to that decision.  If Sandoz didn't lose any sales, then replacement cost will be the measure of damages; if Sandoz did lose sales, then it is entitled to recoup what it would have made. With the facts before it, the Court can't resolve the issue with any amount of certainty. Therefore, the Court will deny Exel's Motion for Summary Judgment on the measure of damages. The Court recognizes its duty to decide the issue as a matter of law but will defer such decision until the factual issue—whether Sandoz lost sales–is resolved.

One issue that need not be further evaluated is the amount of damages if the Court should find that replacement value is the proper measure of damages. The parties don't dispute the amount of damages if the market-value rule applies, but SRT argues that if replacement value applies, a reasonable jury could find that the replacement value is $2.4 million, not $5.9 million. Exel argues that SRT has waived its right to dispute the amount of replacement-cost damages because that was the measure used in this Court's first judgment for Exel, and SRT did not present any countervailing evidence at that time. Now, SRT supports its position with one email from a Sandoz employee that says, "Our cost has been finally derived. [I]t's $2.4 mil[.]" (Ex. B to SRT's Resp. at 2, Doc. 161-3). But, as Exel observes, that same email chain refers to the COGS (Cost of Goods Sold) price to be $5.9 million. (*Id.* at 5). The email stating that Sandoz's cost was $2.4 million is the only piece of evidence SRT offers to create a genuine dispute of material fact on this issue. The fact is material, but the dispute is not genuine.

Exel provides evidence that refutes the unsupported Ochs email as proof of $2.4 million in damages. Exel also provides proof that Sandoz's damages were $5.9 million. Exel points to the deposition testimony of Martin Gargiule to show that Robin Ochs, the author of the $2.4-million-cost email, was not in a position to have the knowledge to make that statement. Instead, Mr. Gargiule, Sandoz's proffered witness on damages, provided a detailed description of the accounting procedures that led to the derivation of $5.9 million as the final cost to Sandoz. Mr. Gargiule testified that since Sandoz purchased much of the pharmaceuticals from a company called Novartis, and that company was Sandoz's sister company, it is more difficult to derive the

cost to Sandoz than merely looking at invoices. The cost to Sandoz is different from the cost to Novartis, and that difference is the result of profit allocation. Costs and profits must be allocated to the correct owners for a variety of reasons: "either for IP, distribution rights, [or] customer relationships." (Gargiule Dep. at 37:5–7). Sandoz paid its sister company for the pharmaceuticals the value "that Novartis believes is fair and appropriate for that product." (*Id.* at 37:7–9). After explaining various aspects of the accounting procedure used to derive Sandoz's replacement cost, including taking out all estimated "rebates, discounts, and returns," Sandoz determined that its cost for the lost pharmaceuticals was $5,890,338.82. (*Id.* at 72–73; *see also* Ex. to Gargiule Dep., Doc. 155-17).

The Court is left to only speculate as to the basis for Ms. Ochs's statement that the final cost to Sandoz was $2.4 million. Speculation wouldn't be the basis for a reasonable jury award; therefore, Exel is entitled to summary judgment on the amount of damages. If replacement cost is the measure of damages used by the Court, the award will be $5,890,338.82.

### D. Federal Law Establishes the Appropriate Rate for Prejudgment Interest

Finally, SRT argues that the Court should use the rate in 28 U.S.C. § 1961 to calculate prejudgment interest. Exel responds with this Court's order of December 5, 2014 calculating prejudgment interest at the rate prescribed by Ohio's prejudgment interest statute. (Op. & Order (Dec. 5, 2014), Doc. 130). Exel argues that this "settled issue" is law of the case. (Exel's Reply at 30). But the Court's earlier decision on prejudgment interest was based on SRT's breach of the MTSA, so the Court applied the Ohio prejudgment interest statute to the state law breach of contract claim. (*See* Op. & Order (Dec. 5, 2014) at 7). Conversely here, the Court is granting judgment on a federal claim brought under the Carmack Amendment. And, as the Court said in that order, "a court hearing a federal claim applies federal common law rules." (Op. & Order at 7, (citing *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 497 (6th Cir. 2013))). The Court will apply federal law, 28 U.S.C. § 1961, to calculate prejudgment interest.

## IV. Conclusion

The Court **GRANTS IN PART AND DENIES IN PART** Exel's Motion for Summary Judgment. (Docs. 154, 155).

The Court **DENIES** SRT's Motion for Summary Judgment. (Doc. 153).

IT IS SO ORDERED.

s/ James L. Graham
                                              JAMES L. GRAHAM
                                              United States District Judge

DATE: May 8, 2017