IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **EXEL, INC. F/U/B/O SANDOZ, INC.**, | Case No. 2:10-cv-994 |
| Plaintiff, | **Judge Graham** |
| v. | **Magistrate Judge Jolson** |
| **SOUTHERN REFRIGERATED TRANSPORT, INC.,** | |
| Defendant. | |

**OPINION & ORDER**

Defendant Southern Refrigerated Transport, Inc. ("SRT") moves for reconsideration of this Court's May 8, 2017 summary judgment order. (Op. & Order, Doc. 184). The parties also filed cross-motions in limine regarding the burden of proof on the issue of damages. (Docs. 198, 199).

**I. Facts**

To say this case has a lengthy and tortuous history is an understatement. With almost seven years of litigation, the Court recites only the *relevant* parts of the history of this case. First, the Court lays out some basic background facts. Second, the Court revisits its Opinion and Order on the parties' cross-motions for summary judgment, which is the subject of SRT's Motion for Reconsideration. Third, the Court describes the facts pertinent to the damages issues analyzed in this order.

**A. Background**

> A truck filled with millions of dollars' worth of pharmaceuticals was stolen. The trucking company—Southern Refrigerated Transport, Inc. ("SRT")—is at fault. The shipper—Sandoz, Inc. ("Sandoz")—claims that the pharmaceuticals were worth $8.6 million. A federal statute—the Carmack Amendment, 49 U.S.C. § 14706 *et seq.*—imposes strict liability on motor carriers for "actual loss or injury to property," but a narrow exception applies if the shipper agrees to a limitation of liability.

(Op. & Order at 1). The three entities involved in this case each had a distinct role in the shipping process:

1

> A "shipper" is "[s]omeone who ships goods to another." *Shipper*, *Black's Law Dictionary* (10th ed. 2014). Here, Sandoz is the shipper.
>
> A "carrier" is "[a]n individual or organization (such as a shipowner, a railroad, or an airline) that contracts to transport passengers or goods for a fee." *Carrier*, *Black's Law Dictionary* (10th ed. 2014). Here, SRT is the carrier.
>
> A "broker" is "[a]n agent who acts as an intermediary or negotiator, esp. between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation." *Broker*, *Black's Law Dictionary* (10th ed. 2014). . . . Here, Exel is the broker.

(Op. & Order at 2, Doc. 184).

Sandoz is a pharmaceutical company. Sandoz was shipping the truckload of pharmaceuticals to its customer, McKesson, Inc. Sandoz assigned its claim for loss to Exel.

### B. Summary Judgment

The parties in this case presented cross-motions for summary judgment. (Docs. 153, 155). The Court denied SRT's Motion for Summary Judgment and denied in part and granted in part Exel's Motion for Summary Judgment. Specifically, the Court found that SRT was liable to Exel for the stolen truckload of pharmaceuticals without any limitation of liability. The Court left open the question of the proper measure of damages, whether market value or replacement cost, citing a lack of evidence on the issue. SRT asks the Court to reconsider two parts of its order regarding damages.

First, SRT asks the Court to reconsider its denial of summary judgment on the issue of the proper measure of damages. Specifically, SRT points to the freshly filed, and complete, deposition transcript of Martin Gargiule to support its argument that Sandoz should only be compensated for the replacement value of the stolen pharmaceuticals. Second, SRT asks the Court to reconsider granting summary judgment on the amount of damages if replacement value were to be the proper measure. The Court found that the evidence supported a replacement value of approximately $5.9 million, but SRT argues that the replacement value should be approximately $2.4 million.

### C. Factual Background Regarding Damages

The central issue before the Court is what measure of damages to apply, and if replacement cost is the proper measure of damages, what is the proper amount of damages? The factual background relevant to this includes Sandoz's damages calculations, Sandoz's witness's testi-

mony on damages, and other evidence that Sandoz was able to replace the shipment to its customer, McKesson.

In its Complaint, Exel indicated that its damages equaled "the value of the lost Shipment." (Compl. at ¶¶ 27, 34, 47, Doc. 2). In its Amended Initial Disclosures, Exel continued to indicate that its damages equaled the value of the stolen cargo. (Ex. A to SRT's Mot. Limine to Exclude Undisclosed Evidence and Testimony at 3, Doc. 205-1).

Sandoz produced spreadsheets showing its calculations for the value of the stolen McKesson shipment. (*See* Docs. 100-1, 155-17). The value could be the "Net Delivery Cost": $8,583,631.10, it could be the "Net Cost": $5,890,338.82, or it could be the "Consolidated Net Cost": $ 2,317,634.73. (Docs. 100-1, 155-17). The parties agree that the "Net Delivery Cost" is equal to market value. The parties disagree about what constitutes replacement cost.

The Gargiule deposition lies at the center of the Court's inquiry. Martin Gargiule was, at the time of his deposition, the Director of Finance in Sandoz's Business Planning and Analysis group. (Gargiule Dep. at 6:2–3, Doc. 189-1). Gargiule was, at the time of the incident, the associate director of financial reporting and accounting at Sandoz. (*See id.* at 11:6–12:4). Gargiule and his team within Sandoz's financial reporting and accounting group prepared the spreadsheet reports that show Sandoz's damages calculations. (*Id.* at 12:21–14:9). Gargiule, while he was not involved in replacing the McKesson order, testified about the nature of Sandoz's ordering system, its inventory procedures, and its customer service reports, all of which serve as indirect evidence regarding the McKesson replacement order and other sales. Gargiule also testified extensively about damages calculations contained in the spreadsheets his team at Sandoz produced. He explained how each category of costs was derived and why each was distinct.

Also relevant to the damages inquiry are two email chains. One includes correspondence from Sandoz's Director of Supply Chain Management, Penny Schumacher, in which Schumacher said that "apparently the replacement order for McKesson was placed yesterday." (Doc. 161-2, PageID 4454). The other email chain includes correspondence from a Sandoz Transportation Supervisor, Robin Ochs, in which Ochs states that "[o]ur cost has been finally derived.  It's $2.4 mil." (Doc. 161-3 at PageID 4460). Ochs also states in the same email chain that the net price of the stolen shipment was $8.5 million, (PageID 4463), and that Sandoz's cost of goods was $5.9 million, (*Id.*).

Also, the parties' joint final pretrial statement indicates that it is uncontroverted that "Sandoz provided McKesson with a subsequent shipment to replace the stolen shipment." (Joint Final Pretrial Statement at 3–4, Doc. 195).

## II. Legal Standards

While the federal rules don't contemplate a motion for reconsideration, they don't forbid it either. Courts may entertain such motions on interlocutory orders. *See Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 952 (6th Cir. 2004). Indeed, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Id.* at 959.

Since the Court is asked to reconsider part of its ruling on a motion for summary judgment, the familiar summary judgment standard applies to the Court's analysis. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And distilled to its essence, the inquiry under Rule 56 is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

"The purpose of a motion in limine is to permit the Court to decide evidentiary issues in advance of trial in order to avoid delay and ensure an evenhanded and expeditious trial." *DWS Int'l, Inc. v. Meixia Arts & Handicrafts, Co.*, No. C-3:09-CV-458, 2011 WL 13157175, at *1 (S.D. Ohio June 3, 2011). Here, the Court decides the issue of which party bears the burden of proof to justify a departure from the default measure of damages under the Carmack Amendment, which is market value.

## III. Discussion

Pending before the Court are three questions. The first is a question of procedure: who bears the burden of proof to justify a departure from the default measure of damages under the Carmack Amendment? The second is a mixed question of law and fact: what measure of damages applies; or, has the proper party borne the burden of justifying a departure from the default

measure of damages? The third question is a question of fact: what is the appropriate amount of damages?

### A. Burden of Proof

Exel and SRT argue past one another in their briefs, so the Court will attempt to synthesize. In their cross-motions in limine, both parties essentially argue that *all* extant case law supports their position and their opponent has none. And both are correct, sort of.

SRT argues that in a Carmack case, the shipper must prove the amount of its damages. That's right. *See CNA Ins. Co. v. Hyundai Merch. Marine Co.*, 747 F.3d 339, 353 (6th Cir. 2014) ("In a Carmack claim, the Supreme Court has set out a burden-shifting framework, in which the shipper may establish a prima facie case with a showing of three basic elements: (1) that the initial ('receiving') carrier received the cargo in good condition, (2) that the cargo was lost or damaged, and (3) the amount of actual loss or damages."). Shippers must prove their "actual loss."

In turn, Exel argues that in a Carmack case, the default measure of "actual loss" is market value—the value the goods would have brought had the shipment been delivered. That's right. *See Total Quality Logistics, LLC v. Macktoon, Inc.*, No. 1:12-CV-620, 2014 WL 656622, at *4 (S.D. Ohio Feb. 19, 2014) ("[T]he proper measure of damages under the Carmack Amendment is 'the value the goods would have brought to [their owner] had [the carrier] delivered the shipment without damage.'") (quoting *Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir.1990)); *see also Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319 (10th Cir. 1991) (holding that actual loss "traditionally is measured by the market value rule."); *Houmani v. Roadway Express, Inc.*, No. 3:07CV1552, 2008 WL 731497, at *1 (N.D. Ohio Mar. 17, 2008).

But that's not always the end of the story, because "[t]he test of market value is at best but a convenient means of getting at the loss suffered." *Ill. Cent. R.R. Co. v. Crail*, 281 U.S. 57, 64 (1930). In fact, replacement cost—and not market value—is the proper measure of damages if a shipper "secured substitute goods after the accident, lost no sales, and had no opportunity for a sale with these damaged goods." *Oak Hall*, 899 F.2d at 296; *accord Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.*, 213 F.3d 1118, 1120 (9th Cir. 2000) ("Replacement cost is an appropriate measure of damages where the injured party could mitigate the loss by replacing the goods."); *Meletio Sea Food Co. v. Gordons Transps.*, 191 S.W.2d 983, 986 (Mo. Ct. App. 1946) (same). But which party should bear the burden of justifying a departure from the default rule?

5

Exel argues that the carrier bears the burden to justify a departure from the default rule. Most courts agree. *See, e.g.*, *Robert Burton Assocs., Inc. v. Preston Trucking Co., Inc.*, 149 F.3d 218, 221 (3rd Cir. 1998) ("[T]he carrier has the burden of proof to demonstrate that a court should deviate from the market value rule"); *Eastman Kodak*, 949 F.2d at 319 (10th Cir. 1991) ("[T]he burden of proof is on the carrier to show that the market value rule will not result in a just measure of actual damages." (quoting *Gold Star Meat Co. v. Union Pac. R.R. Co.*, 438 F.2d 1270, 1273 (10th Cir. 1971))); *Fed. Ins. Co. v. Mitsui O.S.K. Lines., Ltd.*, No. 99-C-4285, 2001 WL 34064693, at *12 (N.D. Ill. July 18, 2001) (same). This Court agrees: the carrier bears the burden of proof to show special reasons why the market value rule should be discarded in favor of a more accurate measure. *Ill. Cent. R.R. Co.*, 281 U.S. at 64. This comports with most courts' opinions and a main purpose of the Carmack Amendment, which is to provide a "uniform system of carrier liability that provides certainty to both shippers and carriers." *Delta Research Corp. v. EMS, Inc.*, No. 04-60046, 2005 WL 1981775, at *5 (E.D. Mich. Aug. 16, 2005).

SRT argues that it has successfully borne that burden by showing that Sandoz didn't lose sales because it replaced the stolen shipment to McKesson. And on this point, Exel puts up little resistance—more on that later, but let's assume for the sake of argument that Sandoz did replace the McKesson shipment. Exel argues that proof of lost sales doesn't end with the single McKesson order—Sandoz lost the opportunity to sell inventory to another customer or to McKesson in a subsequent order. Exel maintains that since the carrier, SRT, bears the burden of proof to show that the market value rule will not result in a just measure of actual damages, SRT must prove that Sandoz did not lose any future, unidentified sales.

The Court is unpersuaded. While SRT does bear the burden to justify a departure from the market-value rule, that burden does not extend to chasing down every possible theory of damages, including theories not clearly articulated in the pleadings or pursued in discovery. Even one case Exel uses to support its argument shows why Exel is wrong on this point.

In *Robert Burton Associates, Incorporated v. Preston Trucking Company, Incorporated*, the Third Circuit analyzed a similar argument, where the shipper argued that it was "a lost volume seller, as it could have sold the replacement shipment to a separate customer to gain a profit had the first shipment not been lost by defendant." 149 F.3d 218, 220 (3rd Cir. 1998). There, the carrier showed that the shipper's customer "accepted and paid for the second shipment and that [the shipper] was able to fill the orders of its other customers." *Id.* at 221. However, the Court

found a dispute of material fact because the shipper offered a "certification" from one of its employees, claiming "that it was 'highly probable' that Burton lost sales because the goods stolen from it were competing with Burton's products." *Id.* at 220. The same employee certified that after the lost shipment, "'there was a drastic decline in sale of our goods in the market.'" *Id.* (quoting certification of Carl Ioos).

The Ioos certification was critical to the *Robert Burton* court. It reasoned that replacement cost would "in one sense" make Burton whole, "as it will have received the *direct* benefit of its bargain with Anpesil [Burton's customer]." *Id.* at 221. "But in view of the Ioos certification the foregoing analysis is not complete." *Id.* Even in *Robert Burton*, the court held that "[o]f course, the carrier bears the burden of proof to demonstrate that a court should deviate from the market value rule." *Id.* at 221. And there, the carrier produced evidence that the shipper replaced the lost shipment and was able to fill its orders to other customers. But the same court found a dispute of fact only due to the Ioos certification produced by the *shipper*. In Exel's view, as it applies to this case, SRT—the carrier—would have to produce the mirror image of the Ioos certification: a certification that Sandoz did not lose any sales volume. But in *Robert Burton*, the shipper produced the certification that it did lose sales volume. As the Court reads this case, the *Robert Burton* court would have granted summary judgment to the carrier but for the shipper-produced evidence of lost sales volume. And here, Exel has produced no evidence that it lost sales volume.

The Court sees three reasons why the carrier should not have to be saddled with this responsibility once it shows a good reason to depart from the default rule. One: unless the shipper has pursued this damages theory throughout the case—including during discovery—how is a carrier supposed to know that they would need to disprove this theory of damages? Two: all the evidence is uniquely situated with the shipper on this point. Three: the variation-from-market-value rule is not so wooden as to require a carrier to hunt down every possible damages theory and disprove it before bearing its burden to justify departure from the market-value rule.

To summarize, the carrier bears the burden to justify a departure from the default measure of damages under the Carmack Amendment. However, the carrier can carry this burden by showing that the shipper did not lose the sale that was the subject of the lost shipment and need not disprove a type of lost-volume-seller theory of damages that was not clearly articulated by the plaintiff until after the close of discovery.

### B. Reconsideration of Measure of Damages

Under the Carmack Amendment, deciding the proper measure of damages is generally a question of law. (Op. & Order at 18, Doc. 184). And typically, "actual loss" under the Carmack Amendment is the market value of the goods. SRT wants to limit damages to replacement value, and it bears the burden to justify departing from the market-value damages rule. The Court held that it couldn't rule on the proper measure of damages because it simply lacked the evidence to make such a determination. (*See id.* at 18–22). Part of the problem was that the Court was unable to locate in the record the critical portions of a deposition cited by SRT. (*Id.* at 20). Only excerpts of the Gargiule Deposition had been filed with the Court, and the excerpts didn't include the key quotes and sections cited by SRT in support of its position. (*See* Excerpts from Gargiule Dep., Doc. 100-2).

> The Court held that it
>
> must decide what measure of damages to apply as a matter of law. But whether Sandoz lost any sales is a factual issue that the Court must resolve on its way to that decision. If Sandoz didn't lose any sales, then replacement cost will be the measure of damages; if Sandoz did lose sales, then it is entitled to recoup what it would have made. With the facts before it, the Court can't resolve the issue with any amount of certainty. Therefore, the Court will deny Exel's Motion for Summary Judgment on the measure of damages. The Court recognizes its duty to decide the issue as a matter of law but will defer such decision until the factual issue—whether Sandoz lost sales—is resolved.

(Op. & Order at 21).

Now, the Court must decide whether SRT has shown a good reason to justify departing from the default measure of damages.

SRT argues that there is no genuine dispute that Sandoz did not lose sales. (Def.'s Mot. Recons. at 3–8). The Court agrees, and since the Court finds that Sandoz did not lose sales and it provided its customer McKesson with a replacement shipment, the Court holds as a matter of law that replacement cost is the proper measure of damages here. The critical difference upon reconsideration is the presence of the entire Gargiule deposition[1] and the uncontroverted facts listed in the parties' joint final pretrial statement. This evidence makes it clear that Sandoz lost no sales as a result of the stolen shipment.

---

[1] The Court now realizes why it couldn't locate the relevant portions of the Gargiule deposition: the relevant excerpts weren't in the record. Exel followed the applicable local rule by filing only the portions of the deposition that it deemed relevant to its arguments. (*See* S.D. Ohio Civ. R. 7.2(e)). But SRT never filed the portions of the Gargiule deposition that it cited. Exel argues that SRT violates this Court's local rules by filing the entire Gargiule deposition now, but the Court will permit the filing in the interest of justice.

Three pieces of evidence indicate that the McKesson order was replaced and Sandoz lost no sales: (1) the parties' Final Pretrial Statement lists this as an uncontroverted fact, that "Sandoz provided McKesson with a subsequent shipment to replace the stolen shipment," (Joint Final Pretrial Statement at 4, Doc. 195); (2) an email from a Sandoz employee indicating the McKesson order was replaced; and (3) the deposition testimony of Martin Gargiule, which indicates that if Sandoz had lost a sale to McKesson, it would have "been dinged" on its customer service report cards, but it was not.

The only evidence of Sandoz replacing the McKesson order in the record at the time of this Court's earlier opinion was an email from a Sandoz employee, Penny Schumacher, that said, "apparently the replacement order for McKesson was placed yesterday." (Doc. 161-2 at PageID 4454). The Court refused to place the burden of a weighty decision on the wobbly frame of this email. But now, the parties have made clear that it is uncontroverted that Sandoz replaced the stolen McKesson shipment. (Doc. 195 at 4).

Sandoz offered Gargiule as their witness to discuss Sandoz's damages. (Gargiule Dep., Doc. 189-1). Gargiule testified that he did not have "any direct knowledge of how [Sandoz] replaced the load," (*Id.* at 104:3–4) but he did have direct knowledge of the ordering and inventory process used by Sandoz. And Gargiule's knowledge of that process and how it manifested here shows that Sandoz replaced the McKesson order and didn't suffer the loss of another McKesson order.

> The reason we are very confident they received this back, we would have been able to maintain our customer service levels, which is something they tracks [sic] against us. If they would missed [sic] a sale because they didn't get the material, we would have been dinged for it on our report cards. So that's why we are very confident this went back through.

(Gargiule Dep. at 114:18–25). So while Gargiule had no direct knowledge of how the McKesson order was replaced, he did have direct knowledge of Sandoz's customer service "report cards," which he testified did not indicate a missed shipment. This is evidence that Sandoz was able to replace the McKesson order. The Gargiule deposition is in line with the parties' final pretrial statement and the Schumacher email in concluding that Sandoz was able to replace the McKesson shipment and not lose a sale.

Finally, the Court notes the silence by Gargiule, and any other Sandoz damages witness, on the issue of other lost sales. Gargiule explained Sandoz's damages calculations, which did not include any evidence of lost sales other than the McKesson sale. If Exel intended to pursue this

9

theory of damages, its damages witness would have testified about it or included other lost sales in his damages calculations. To summarize, SRT has carried its burden to show that Sandoz was able to replace the McKesson order.

But Exel argues that while it may have replaced the order, it still lost sales. Exel's argument is that it's similar to a "lost-volume seller"—that while it might not have lost the specific McKesson sale, "either someone else missed out or McKesson itself . . . did not receive an additional order later." (Pl.'s Resp. to Def.'s Mot. Recons. at 8–9, Doc. 193).

SRT objects to this argument on two separate grounds. One: SRT argues that Exel articulated the lost-volume-seller theory of damages for the first time in a May 17, 2017 telephone conference; so, since this new theory of damages is brought only on the eve of trial, it would unfairly prejudice SRT. (Def.'s Mot. Recons. at 6–7). Two: even if the Court permitted Exel to argue that it is a lost-volume seller, there is no evidence in the record to support Exel's theory. The two arguments are related: the reason Exel has no evidence to support its theory is because it never articulated it before the May 17, 2017 telephone conference.

Exel denies that the lost-volume-seller theory of damages is new. Exel asserts that in its Amended Initial Disclosures, Exel asserted two separate damages theories: one premised on replacement cost, and the other the "value of the stolen cargo as referenced in invoices provided by Sandoz to SRT." (Exel's Am. Initial Disclosures at 3, Doc. 189-2). Exel argues that the "invoice value" referenced in its Amended Initial Disclosures is the basis for the lost-volume-seller theory of damages.

Exel's disclosures don't paint a crystal clear picture of the lost-volume-seller theory of damages. It's enough to put SRT on notice that Exel could pursue damages for the invoice value of the McKesson shipment. But it only put SRT on notice that Exel would pursue damages for the value of the lost sale to McKesson, not damages for hypothetical lost sales to other unnamed customers or a separate lost sale to McKesson.[2]

Exel's failure to explore this damages theory in discovery is obvious when it presents what little evidence it has on the issue. Exel argues that the Gargiule deposition "underscores [Exel's] ability to establish at trial lost sales as a direct result of SRT's failure in the transporta-

---

[2] For this same reason, SRT moves to exclude at trial evidence that Exel didn't disclose relating to Sandoz incurring damages from lost sales volume. (*See* SRT's Mot. Limine, Doc. 205).

tion chain." (Pl.'s Resp. to Def.'s Mot. Recons. at 6, Doc. 193). Exel cites this excerpt of the Gargiule deposition:

> I think the one thing, again, what I'm trying to convey is McKesson is ordering more than just these materials. We have over 2,000 to 7,000 SKUs that they order from. That's equivalent to the product we discussed earlier.
>
> They would have gone back into their system, take this volume out, because they didn't get it, reprocess while other materials are being requested. So they would have had orders coming on the next day, next day, next day what they need.

(Gargiule Dep. at 114:7–17). It isn't clear that the "they" in the above deposition excerpt is Sandoz; it could be McKesson. (*See* Gargiule Dep. at 114:8–9 ("McKesson is ordering . . . .")). Either way, this isn't evidence that Sandoz lost any sales; it's just a description of a company's supply chain.

But Gargiule goes on to say that Sandoz would have known if McKesson didn't receive replacement product because it would have reflected on Sandoz's "report card." (*Id.* at 114:23–24). But McKesson never "dinged" Sandoz for a failed delivery on its "report card." This is the only evidence Exel provides to support its lost-volume seller theory of damages. Construing this evidence most generously to Exel, it supports the theory that Sandoz had to replace the McKesson order out of existing inventory, but it says nothing about whether this cost Sandoz any future sale.

Exel's only other argument turns on conjecture and speculation. Exel states that "whether having to fill the McKesson order twice meant that another customer's order did not get filled is the very open question which the Court found trial worthy; alternatively, this may also have caused McKesson to place one less order down the time line and outside of this order period, which is precisely the lost volume sales scenario." (Pl.'s Resp. to Def.'s Mot. Recons. at 8). A very open question indeed, one which should be supported by evidence by now if Exel intends to present it to a jury. But there's no evidence to answer this "open question."

Furthermore, Exel states that given Sandoz's inventory practices, "the reasonable inference is that another sale that was supposed to be made in 2008 was not. McKesson got its order filled, but either someone else missed out or McKesson itself received a replacement order timely, but did not receive an additional order later." (*Id.* at 8–9). That's not a reasonable inference. That's just a bald restatement of the lost-volume-seller theory. *See, e.g.*, *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 997 (6th Cir. 2007) ("In order to qualify as a lost volume seller, Chi-

11

cago Title must prove that it had access to sufficient supply to make both sales and that it would have completed the additional sale even if it made the first sale.") (analyzing Ohio breach-of-contract law). In theory, perhaps Sandoz could qualify as a lost-volume seller; but in fact, there is no evidence to support Sandoz's qualification as a lost-volume seller.

Perhaps nothing crystalizes the problem here quite like the parties' final pretrial statement. In the section labeled "Issues of Fact and Law," SRT lists a number of contested issues of fact related to lost sales. But as far as the Court can tell, these issues are either conclusively resolved, or there aren't any facts:

> a) How much cost did Sandoz incur for the replacement shipment it provided to McKesson?
> b) Did Sandoz lose any sales as a result of the stolen shipment?
> c) If Sandoz lost sales, which customers placed an order that Sandoz was unable to fill and when?
> d) If Sandoz lost sales, which products were unavailable to fill any customer's request?
> e) If Sandoz lost sales, what was the quantity and value of the product(s) that Sandoz was unable to provide to fill the customer's request?
> f) Has Sandoz received any financial reimbursement from an insurance carrier or Exel for the lost shipment?

(Doc. 195 at 4–5). The answer to a): $5,890,338.82. The answer to b): Sandoz did not lose the McKesson sale, and there's no evidence that it lost any other sales. The answer to c): no evidence. The answer to d): no evidence. The answer to e): no evidence. The answer to f): no evidence. The final four "contested issues of fact" aren't really contested; a contest requires two opposing sides. Here, there is simply no evidence on either side.

If there was evidence of lost sales volume, summary judgment might not be appropriate. In *Robert Burton*, the Third Circuit found that evidence of a replaced order and evidence of generalized lost sales was enough of a conflict to find a genuine dispute of material fact existed. 149 F.3d at 221. Here, no such dispute of fact exists, and while there's not a lot of evidence, all the evidence is on one side of the dispute—SRT's side.

To summarize, the proper measure of damages is replacement cost. This is so because Exel's "actual damages" don't include lost sales because the only evidence indicates Exel lost neither the McKesson sale nor other sales. There is no genuine dispute of fact on this point because "the evidence is such that [no] reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To the extent SRT is required

12

to justify deviating from the default damages rule under the Carmack Amendment, SRT has borne its burden of proof. Accordingly, the Court reconsiders the pertinent section of its summary-judgment Opinion and Order, (Doc. 184), and grants summary judgment on this issue to SRT—replacement cost is the proper measure of damages.

But, there's one more issue: what is the replacement cost?

**C. Reconsideration of the Amount of Damages**

SRT also asks the Court to reconsider one of its other decisions. The Court held that if replacement cost was the proper measure of damages, the amount of damages would be $5.9 million, not $2.4 million. Specifically, the Court held the Ochs email, which stated that Sandoz's cost was $2.4 million, did not create a genuine dispute of material fact when set up against the Gargiule deposition, which explained why Sandoz's cost was $5.9 million. (Op. & Order at 21–22). Here's what the Court decided in its earlier order:

> One issue that need not be further evaluated is the amount of damages if the Court should find that replacement value is the proper measure of damages. The parties don't dispute the amount of damages if the market-value rule applies, but SRT argues that if replacement value applies, a reasonable jury could find that the replacement value is $2.4 million, not $5.9 million. Exel argues that SRT has waived its right to dispute the amount of replacement-cost damages because that was the measure used in this Court's first judgment for Exel, and SRT did not present any countervailing evidence at that time. Now, SRT supports its position with one email from a Sandoz employee that says, "Our cost has been finally derived. [I]t's $2.4 mil[.]" (Ex. B to SRT's Resp. at 2, Doc. 161-3). But, as Exel observes, that same email chain refers to the COGS (Cost of Goods Sold) price to be $5.9 million. (Id. at 5). The email stating that Sandoz's cost was $2.4 million is the only piece of evidence SRT offers to create a genuine dispute of material fact on this issue. The fact is material, but the dispute is not genuine.
>
> Exel provides evidence that refutes the unsupported Ochs email as proof of $2.4 million in damages. Exel also provides proof that Sandoz's damages were $5.9 million. Exel points to the deposition testimony of Martin Gargiule to show that Robin Ochs, the author of the $2.4-million-cost email, was not in a position to have the knowledge to make that statement. Instead, Mr. Gargiule, Sandoz's proffered witness on damages, provided a detailed description of the accounting procedures that led to the derivation of $5.9 million as the final cost to Sandoz. Mr. Gargiule testified that since Sandoz purchased much of the pharmaceuticals from a company called Novartis, and that company was Sandoz's sister company, it is more difficult to derive the cost to Sandoz than merely looking at invoices. The cost to Sandoz is different from the cost to Novartis, and that difference is the result of profit allocation. Costs and profits must be allocated to the correct owners for a variety of reasons: "either for IP, distribution rights, [or] customer rela-

> tionships." (Gargiule Dep. at 37:5–7). Sandoz paid its sister company for the pharmaceuticals the value "that Novartis believes is fair and appropriate for that product." (Id. at 37:7–9). After explaining various aspects of the accounting procedure used to derive Sandoz's replacement cost, including taking out all estimated "rebates, discounts, and returns," Sandoz determined that its cost for the lost pharmaceuticals was $5,890,338.82. (Id. at 72–73; see also Ex. to Gargiule Dep., Doc. 155-17).
>
> The Court is left to only speculate as to the basis for Ms. Ochs's statement that the final cost to Sandoz was $2.4 million. Speculation wouldn't be the basis for a reasonable jury award; therefore, Exel is entitled to summary judgment on the amount of damages. If replacement cost is the measure of damages used by the Court, the award will be $5,890,338.82.

(Op. & Order at 21–22).

SRT argues that the $2.4 million in the Ochs email is an approximation of the "consolidated net cost" listed on Sandoz's spreadsheet, which lists a value of $2,317,634.73. (Doc. 100-1). While there is no direct evidence that Ochs approximated the value listed in the spreadsheet, the numbers are close enough that SRT asks the Court to infer as much.

The spreadsheet is not without explanation; Gargiule explained it in full. Specifically, he explained, as detailed above, that the cost to Sandoz was $5,890,338.82. (Gargiule Dep. at 73:7–11). SRT argues that the Court should reconsider the *unredacted* version of the spreadsheet that includes the lower "consolidated net cost" number. But that version was available to the Court when considering its earlier order. (*See* Def.'s Ex. C, Doc. 100-1). The Court reviewed the document, and simply referred to the more legible version of the spreadsheet, (*see* Doc. 155-17), for ease of reference in its Opinion and Order. The unredacted version of the spreadsheet does not change the Court's opinion.

SRT has nothing else to support its position. SRT never sought documents, testimony, or other evidence supporting the $2.4 million damages number. And it should come as no surprise that $5.9 million is Sandoz's replacement cost: that's the number Exel provided in its initial disclosures, (Doc. 205-1 at 3), and it's the number the Court awarded the first time around when awarding replacement-cost damages under the MTSA, (Op. & Order at 16–17, Doc. 112). But SRT persists, arguing that a jury should decide whether to give weight to the Ochs email and the "corroborating" spreadsheet or to the Gargiule deposition. But the Court's original analysis on this issue remains unchanged in light of the entire Gargiule deposition. That deposition and its supporting exhibits show that Sandoz's replacement cost was $5.9 million, not $2.3 or $2.4 mil-

lion. And as the Court stated before, the Ochs email is not enough to create a genuine dispute of this material fact. Since no reasonable jury could find that $2.4 million was Sandoz's replacement cost, SRT's Motion for Reconsideration on this point is denied.

**IV. Conclusion**

On the parties' cross-motions in limine, the Court holds that SRT has the burden of proof to justify a departure from the default measure of damages under the Carmack Amendment.

The Court **GRANTS IN PART AND DENIES IN PART** SRT's Motion for Reconsideration. (Doc. 189). The clerk is directed to enter judgment for Exel in the amount of $5,890,332.82 plus prejudgment interest pursuant to 28 U.S.C. § 1961.

The clerk is directed to terminate all pending motions and vacate the final pretrial conference and trial dates.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: August 22, 2017